[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S REQUEST FOR PERMANENT INJUNCTION
In this case, the plaintiff has moved for a permanent injunction. The claim is made that Mr. Nardi (1) breached his non-compete and confidentially agreement with Custard (2) breached his duty of loyalty (3) tortiously interfered with Custard's contractual and business relations (4) violated the Connecticut Uniform Trade Secrets Act (CUTSA), § 35-50 et seq of the general statutes and (5) violated the Connecticut Unfair Trade Practices Act (CUTPA), § 42-110a et seq of the general statutes. Custard accuses Mark Adjustment of (tortious interference with Custard's contractual and/or business relations (2) a violation of CUTSA and (3) a violation of CUTPA.
The court will give a brief overview of the facts; it will try to discuss the facts in more detail in those parts of the decision which deal with the specific claims made by the plaintiff.
Allied Adjustment Service hired Mr. Nardi in September, 1982. At that time, he signed an agreement with Allied that contained a non-compete and a confidentially clause. On September 1, 1997, Allied sold its business to Custard including all its assets which would include the non-compete and confidentially agreement. Allied was, and Custard is, in the business of adjusting claims for insurance companies and self insurers. Mr. Nardi continued to work for Custard after the sale. Nardi had been an officer in Allied and was an officer in Custard. Shortly after Custard took control of Allied operations it changed the terms of Mr. Nardi's compensation — he had been receiving a commission on percentage of gross sales, with Custard he was to receive a guaranteed salary and any income beyond this would be geared to the profits of the entire northeast region. Custard claims that their new compensation package offered Nardi the chance to increase his income; Mr. Nardi viewed it as a 25% reduction in his income. Custard embarked on a restructuring policy when it assumed control of Allied, closing some Allied offices and terminating employees. Mr. Nardi became concerned about his future at Custard so at the end of September or beginning of October, 1997, he called Mr. John Markle, president of Mark Adjustment (Mark). He had worked for Markle prior to coming to Allied in 1982. He talked with Markle about going to work for Mark. There was conversation between him and Markle about lining up Custard customers as part of an effort to determine whether the switch to Mark would be feasible. Mr. Nardi also told Markle he could bring certain key employees with him to Mark. Nardi then called four select employees and talked with them about the desirability of their going to work for Mark. He told one or two of these employees they were scheduled for termination by Custard. Nardi had learned this from two Custard management people — whether CT Page 5085-ds these employees were actually scheduled to be terminated is in dispute between the parties. Nardi arranged meetings between the employees and Markle, advised them after these meetings that going over to Mark would be a good idea for them, he recommended these people to Mr. Markle. Throughout this period employee morale was low due to the Custard policy of closing down offices and layoffs.
Mr. Nardi, after his initial contract with Markle, began contacting certain Custard customers. He told them that he was thinking of going to work for Mark and learned that they would switch their business to Mark if he went there. These customers were not pleased with the Custard takeover of Allied and were not pleased with and/or willing to accept price increases Custard was proposing.
Mr. Nardi claims that, despite the above alleged activity, during all this time he was trying to advance Custard's interests. He brought in some new business and said he made efforts to retain the customers for Custard which he had been having conversations with about the possibility of his move to Mark. In fact, on October 24, 1997, he, Mr. Shove, a Custard officer, and Steve Hubbard, a former Allied and now Custard officer met with a very important customer, HARRG.
On November 10, 1997, Custard terminated Nardi's employment; the reasons offered for this are hotly disputed. HARRG moved its business to Mark shortly before Nardi was terminated. Several other Custard customers joined HARRG shortly after Nardi was terminated and went to work for Mark. Three of the employees mentioned previously who had been approached by Nardi also went to work for Mark. It should be noted that these former Custard employees were people Nardi worked with in servicing the same customers, who at least as to business in the northeast, shifted their business to Mark when Nardi joined Mark.
The trade secrets and/or confidential information that the plaintiff claims was misappropriated by Nardi include the names of so-called contact people that a marketing person like Nardi would have to deal with to get the insurance adjustment business of their companies. Certain pricing information is also included in the claim as were customer lists. Nardi said he developed the information about contract people and other information relative to customers through his own hard work and personal efforts and in any event much of the information is generally available in the industry.
As noted, the business Custard and Mark are engaged in is adjusting claims for insurance companies and self insurers. The industry is highly CT Page 5085-dt competitive but business is referred from one company to another if one company cannot handle the particular job. Mark's business is basically confined to the northeast whereas Custard is a national company.
The court will first discuss which law is applicable to the resolution of these claims. Then the court will discuss the individual legal claims — first against Mr. Nardi then against Mark Adjustment.
 WHAT LAW GOVERNS THE CLAIMS MADE BY THE PLAINTIFF
When Mr. Nardi was first hired by Allied Adjustment Service (Allied) in September, 1982, he signed an agreement. It was a fairly standard non-competition and confidentiality agreement. It provided that while he was employed by Allied and for a 24-month period after such employment, he could not solicit or accept claims in a 50-mile radius of the employee's office and it further provided that the names of Allied clients are the property of Allied and are confidential. All information used by the employee in soliciting clients, including things like brochures and names or personnel of the clients, "are trade secrets, confidential and are valuable property of Allied" and any such information developed or used by an employee, such as Nardi, during his or her employment "shall remain the property of Allied." The unenforceability of certain portions of the agreement is not to affect the validity of other portions that are otherwise enforceable. The employee "acknowledges" that a remedy at law for a violation of the agreement would be inadequate and "therefore (the employee) agrees that Allied shall be entitled to injunctive relief in case of any. . . . breach or threatened breach." The key clause determinative of the issue now before the court is paragraph 8 which states:
 "All questions pertaining to the validity, construction, execution and performance of this Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Massachusetts."
The significance of the choice of law provision is primarily that if Massachusetts law governs, statutory claims under the Connecticut Unfair Trade Practices Act, § 42-110a et seq (CUTPA) and possibly the Connecticut Uniform Trade Secrets Act, § 35-50 et seq (CUTSA) would be barred. The plaintiff concedes that if Massachusetts law governs "all facets of the parties' dealings, then Custard would be barred from bringing an unfair trade practices claim" (p. 21 of 7/16/99 brief). This is so because there is no evidence in this case that any of CT Page 5085-du the alleged wrongs occurred in Massachusetts, so under the unfair trade practices statute of that state no claim would lie. Clinton HospitalAssoc. v. Corson Group, Inc., 907 F.2d 1260, 1265 (CA 1, 1990); BushkinAssoc. v. Raytheon Co., 473 N.E.2d 662, 671.
If Massachusetts law does apply to all the dealings between the parties the viability of the tort claims would not be affected. As will be discussed, the court could find no difference between the law of Massachusetts or Connecticut as it applies to the breach of the duty of loyalty and tortious interference with contractual or business relationships claim made by the plaintiff.
Non-compete and confidentiality agreements are just contracts and general rules of contract interpretation apply. In Conflict of Laws, Scoles Hay, 1984, the following observation is made at § 18.1, p. 632.
 "Parties enter into contracts deliberately. It has therefore been said that `in contracts . . . there is but one basic policy, namely, protection of the expectations of the parties.' For this reason, `predictability in choice-of-law decisions is an important value in contracts.' Such predictability is served, and party expectations are protected, by giving effect to the parties' own choice of the applicable law (party autonomy)."
There is no question that the parties agreed to have Massachusetts law govern the terms of this non-compete and confidentiality agreement; both parties agree that Massachusetts law governs the plaintiff's breach of contract claim. What about the other claims? To answer this, it is first necessary to examine and try to ascertain what were the reasonable intentions and expectations of the parties when this agreement was signed in 1982. First, it should be understood that Allied was a company with headquarters in Massachusetts but offices in at least the states of Connecticut, New York and New Jersey. At the time Mr. Nardi signed the agreement, he lived in Connecticut and his base of operations was located in Connecticut during the time he worked for Allied. These types of agreements are important to the firms that wish to have them signed especially in highly competitive industries such as this one. They are not global agreements covering all the conditions and terms of employment but specifically geared to protecting what the employer believes is confidential information and to protect the client customer base. Often, as here, they are entered into with at-will employees. This CT Page 5085-dv agreement, in fact, specifically says in paragraph 4: "Nothing herein contained shall be deemed to constitute an agreement by Allied to retain the Employee in its employ." The purpose of employers including choice of law provisions in agreements like this is the sometime confusing and varied state of the law as regards the enforceability of such agreements, particularly as they involve anti-competitive covenants. An examination of 54a Am.Jur.2d. "Post Employment Anti-Competitive Covenants," § 888 pp. 186 et seq indicates many states have statutes governing their enforcement. Some states hold new consideration is required for such an agreement, others do not have this requirement, § 895, p. 193, the jurisdictions disagree as to whether continued employment or the promise thereof is sufficient consideration. § 898, p. 197. "In several jurisdictions, as a condition precedent for enforcement of a restrictive covenant, the employee must have been privy to trade secrets or must possess a unique skill, and this requirement applies to nonsolicitation as well as noncompetition covenants," § 918, p. 215, other jurisdictions take a different view if the employee has developed customer good will and customers are likely to follow him or her when he or she leaves the current employ. § 919, p. 216. In § 925 at p. 221, it is noted that "At least one jurisdiction views trade secrets but not confidential information as protectable business interests of an employer." But see a case like Frederick Chusid Co. v. Marshall Leeman Co., supra, 326 F. Supp. at p. 1059, which suggests that if parties signed a confidentiality agreement regarding information, materials or techniques learned at their employment, the employee can avail itself of post-termination protection under the agreement even if the referenced material or information is not a "trade secret." Paragraph 2 of the Allied, Nardi agreement references certain items and information defined as Allied's "exclusive property" and states they are "trade secrets, confidential and are valuable property of Allied." Arguably, pursuant to this agreement, Allied could claim broader protection than provided by ordinary trade secret statutes.
A company like Allied had a strong interest in securing an employee's agreement to a non-compete agreement. We have seen that Custard certainly regarded non-compete and confidentiality agreements with its employees as a major concern. Given the confusing state of the law regarding the ambit and enforceability of these types of agreement and the fact that Allied had offices in several states, it is understandable that Allied in 1982 would have wanted a choice of law provision in the agreement referencing one state, its home state, Massachusetts. It would be a means of ensuring that there would be uniform interpretation and enforcement of these agreements that both employer and employee could rely on. There is a good reason then for a company like Allied to want a CT Page 5085-dw choice of law provisions in its noncompete and confidentiality agreement. However, the court can find no ascertainable difference between the courts of Connecticut and Massachusetts in their interpretation of the common law tort of breach of fiduciary obligation brought against a former officer of a corporation. Also, the court believes that the Massachusetts courts interpret the tort of tortious interference with contractual and business relationships the same way our courts do. They both dutifully refer to the appropriate sections of the Restatement (Second) of Torts. § 766A et seq; see Melo-Tone Vending, Inc. v.Sherry, Inc., 656 N.E.2d 312, 314-315 (Mass.App.Ct., 1995); G.S.Enterprises v. Falmouth Marine, 571 N.E.2d 1363, 1369-1370 (Mass.Sup.Ct., 1991); cf Herman v. Endress, 187 Conn. 374, 376-377 (1982); Blake v.Levy, 191 Conn. 257, 261 fn. 2 (1983). The court has no reason to believe the law of New York or New Jersey is any different in this regard and in any event when Mr. Nardi signed this agreement he was a Connecticut resident and from when he began his employment with Allied had his base of operations in Connecticut.
One may very well ask what this reference to common law has to do with the ambit of the choice of law provision in this agreement and the ascertainable intention of the employer in having it included. The point is that the choice of law agreement in this contract is very limited. It says, in effect, that Massachusetts law shall apply to "All questions pertaining to the validity, construction, execution and performance ofthis agreement . . ." That language and its limited scope is understandable in light of a need companies like Allied would have in seeking to provide that its non-compete agreements were uniformly applied. There is no such need, ascertainable to the court, regarding any need to ensure that widely recognized common law torts protective of business interests be uniformly recognized and enforced in states where Allied operated. The states of concern here interpret and follow the common law in the same way.
But there is even a more positive reason why Allied would only want the choice of law provision apply to the agreement.
It must be kept in mind that this is not some dry exercise in abstract choice of law concepts and cases. The predicate to the choice of law problem is a question of contract interpretation and that in part has to be performed in the business context companies find themselves in. From this perspective, there is good reason to interpret the language of the agreement regarding choice of law in the narrow way the plaintiff suggests. A different interpretation would mean that Allied, whose lawyers presumably drew up this agreement, knowing as it must have that CT Page 5085-dx it had offices in several states besides Massachusetts intentionally chose a choice of law clause in their non-compete and confidentiality agreements that would on the one hand ensure uniform enforcement of such agreements but at the same time would strip Allied of its right to resort to highly protective ameliorative and punitive laws like Connecticut's Unfair Trade Practices Law and Uniform Trade Secrets Act,[1]
all of this for no apparent reason since a narrow view of the clause would still allow uniform application of the agreement, leave common law remedies similar to that of the home state in place and would allow Allied to take advantage of non-Massachusetts statutes regarding the operations of offices in states other than the home state.
Or, to put the whole matter another way, there is no doubt that the parties had the right to agree that only the non-compete and confidentiality agreement should be governed by Massachusetts law and that the question of what state law would apply to other claims that might arise between the parties would be left to ordinary choice of law analysis. If that is true, what other language could they have used other than that used here to accomplish that purpose. The relevant contract clause says: "All questions pertaining to the validity, construction, execution and performance of this agreement shall be construed under Massachusetts law (emphasis added). I suppose they could have explicitly said Massachusetts law applies to this agreement and not to other disputes that may arise between the parties except as otherwise dictated by general choice of law principles. See Restatement, Conflictof Laws 2d. But the wordage actually used is confining enough, to the court to limit the choice of law clause to the agreement and any doubt on this score is resolved by looking to the reasonable interpretation of expectations and intent of the parties which, according to the court's foregoing analysis, dictates that Massachusetts law applies only to the agreement. Cases cited by the defendant do not change the court's opinion. Yes, it is true that Stamm v. Barclay's Bank of N.Y., 153 F.3d 30
(Ca. 2, 1998), does say that the plaintiff' s complaint had to be dismissed because it sought relief under New York and federal law where the parties' choice of law clause stipulating English law applied.Worldwide Commodities v. J. Amicone Co., 630 N.E.2d 615 (Mass., 1994) held that since contract violations were at the core of plaintiff's claims, the choice of law provision providing New York law applied barred a claim under a Massachusetts statute.
But in Stamm, the broad language in the choice of law clause, not present here, dictates the result that court reached:
 "The rights and obligations of the parties arising CT Page 5085-dy out of or relating to the member's membership of and/or underwriting of insurance business at Lloyd's and any other matter referred to in the undertaking shall be governed and construed in accordance with the laws of England."
The agreement then goes on to say that the parties agree that English courts shall have exclusive jurisdiction to settle any dispute and/or controversy of whatever nature arising out of or related to the member's membership of and/or underwriting, etc. . . . id. pp. 31-32. That is not the type of choice of law clause we have in this agreement. WorldwideCommodities is not on point since the choice of law provision said the agreement is governed by New York law and there was no dispute that the conflict between the parties arose under the agreement which was the global agreement between a manufacturer and a distributor regarding the latter's right to distribute the product in designated territory. Here, the rights the plaintiff claims were violated do not arise exclusively and as a result of the agreement. That is, any alleged violations of this agreement are not essential elements of the plaintiff's statutory and common law claims here, so that choice of law provision does not dictate the law to be applied to those claims. See Northeast DataSystems, Inc. v. McDonnell Douglas Computer Systems Co., 986 F.2d 607,608-610 (Ca. 1, 1993), cited in and relied upon by Worldwide Commodities
at 630 N.E.2d pages 617-618. In other words, if there were no agreement or the agreement were held to be unenforceable or the agreement did not have a choice of law provision the plaintiff would still have common law and statutory claims which, it could be argued, could enforce in Connecticut courts under Connecticut law because as to the claimed wrongs this state has the most significant relationship to the occurrences and parties which are the subject of litigation. O'Connor v.O'Connor, 201 Conn. 632, 650 et seq (1986). See Restatement (Second)Conflict of Laws, § 6, 145(2).[2]
In any event, even if the forgoing analysis is incorrect and the choice of law provision in the agreement was intended to and does apply to all relations between the parties and claims that might be raised as a result of the relationship there is good reason to hold that the CUTPA and CUTSA statutes can be enforced in this litigation. As said inConflict of Laws, Scoles Hay, at § 18.4, pp. 637-638:
 § 18.4. Commentators and courts generally agree that, at some point, a state other than that chosen by the parties can assert its public policy and void the stipulation. However, the forum will not CT Page 5085-dz disregard the choice-of-law provision of a contract simply because the chosen law differs in some respects from forum law, but will do so only when the difference rises to the level of public policy."
The discussion in Scoles Hay at §§ 18.4 and 18.5 as well as the discussion in Restatement (Second) Conflict of Laws at § 187 make clear that there are no set or generally recognized rules to determine what is a fundamental public policy; it is basically what the courts in each state say it is. There seems to be basic agreement that statues [statutes] in the insurance area and protecting employees are regarded as fundamental public policy, see Scoles Hay at § 18.5, pp. 641-642, and also statutes outlawing certain contracts or designed to protect people against superior bargaining power. See comment (g) to § 187 of the Restatement.
It would appear that CUTPA is a good candidate for recognition, if we look to the so-called cigarette rule and its criteria for determining what is unfair it can be seen that seriously offensive conduct is one consideration as well as protection of the public against substantial injury. See criteria set out in Cheshire Mortgage Service, Inc. v.Montes, 223 Conn. 80, 105 (1992). If we consider practices that may be deceptive under the act then we are dealing with representations or practices likely to mislead. CUTSA also reflects important public policy considerations in that its enforcement ensures that competition is not waged by unfair or duplicitious means where the devious may be rewarded at the expense of the honest or even more efficient supplier of goods or services. Where operative, both statutes are fundamental to the operation of our business climate in that way which our legislature, by statute, has deemed important and whose importance is underlined by the broad range of remedies provided. Also, the Restatement indicates the greater the number of contacts that form the basis of the purported policy claim to the state deciding whether the matter is fundamental, the more likely that the policy will be found to be fundamental. Here, the two major companies who were customers of Custard, which Mr. Nardi is accused of improperly soliciting, were located in Connecticut. Mr. Nardi's base of operations at the time was in this state as well as many of the activities which it is claimed were violative of the two statutes. He kept his records containing information about the various customers he dealt with at his home. Nardi did meet with Mr. Markle in New Jersey but he had telephone conversations about his possible switch to Mark Adjustment from his home base. It is unclear from the record whether, as to the four employees Nardi talked to about the possibility of their working for Markle, Nardi talked to them in person in New York or New CT Page 5085-ea Jersey offices. But, as will be discussed in the breach of fiduciary obligation section, these people were part of his "team" which serviced two important Connecticut customers mentioned above.
In any event, the court concludes that CUTPA and CUTSA represent fundamental public policies of the State of Connecticut. In part, the court relies on the reasoning expressed in Stamm v. Barclay's Bank ofNew York, supra, at 153 F.3d, p. 33. There, the court did say the choice of law clause required that English law be applied and held that therefore New York and federal statutory remedies could not be pursued. But the court made clear, in a case where fraud and misrepresentation regarding securities transactions were involved, that it was upholding the choice of law clause because "English law remains adequate to discourage fraud and misrepresentation and to provide plaintiff with a remedy should a fraud be proven, id. at p. 33. CUTPA and CUTSA have the same ring to them. There are accusations of violation of fiduciary obligations and improper taking of trade secrets for use by a competitor by someone who was an officer of the corporation making the claim. The defendants' interpretation of the choice of law provision, as noted, would bar application of CUTPA and CUTSA and also the Massachusetts Unfair Trade Practices Act.
Therefore, it is also the court's conclusion that even if the choice of law provision should be interpreted as providing that Massachusetts law applies to all claims it would violate our state's fundamental policy to give an effect to that provision that would prevent suit under CUTPA and CUTSA. That does not mean that under this interpretation the choice of law provision in this agreement is entirely stricken and shall have no further force and effect. The savings clause set forth in paragraph 3 allows the court to enforce the choice of law provision even only insofar as it applies to the breach of contract claim made in regard to the agreement. Besides, as noted regarding the tort claims, neither party has brought to the court's attention, and the court is not aware of, any cases which indicate the law of our state differs in any material way from that of Massachusetts. The court will refer as much as possible to cases from both states and other states in trying to resolve these common law claims.
 ALLEGATIONS AGAIN RALPH NARDI BREACH OF CONTRACT CLAIM
When Mr. Nardi began employment with Allied in September, 1982, he signed a noncompete and confidentiality agreement. The pertinent parts of the agreement read as follows: CT Page 5085-eb
 WHEREAS, the Employee is hired or will be hired by Allied for general services in Allied's business and in return for such services shall receive an annual salary and appropriate expense reimbursement and/or any offered "fringe benefits."
 WHEREAS, the Employee, by accepting employment, shall qualify for Allied's current commission program with the understanding that the guiding principles in regard to such commission program may be adjusted or modified from time to time at the discretion of Allied.
 NOW, THEREFORE, in consideration of this employment and of the premises and covenants herein set forth, the parties hereto hereby agree as follows:
 1. During the Employee's employment and for a twenty-four month period immediately succeeding the termination of the Employee's employment, absent Allied's prior written approval, the Employee shall not directly or indirectly, within the territory serviced by the sales office served or supervised by the Employee, or within a fifty-mile radius of such sales office, whichever is the lesser distance, solicit or accept on behalf of the Employee or any other person or business, insurance claims or investigative assignments from Allied's Clientele. "Allied's Clientele," as referred to in this Agreement, shall be defined as insurance companies, self-insurers, insurance agents, attorneys and other business organizations or persons which have retained Allied's adjustment or investigative services and which have referred, during the term of the Employee's employment, or more claim or investigative assignments to an Allied office served or supervised by the Employee.
 2. The names of Allied's Clientele are and shall remain the exclusive property of Allied and are confidential and of great value to Allied. All information used by the Employee in soliciting clients, including but not limited to brochures, CT Page 5085-ec sales pamphlets and the names of personnel of Allied's clientele, are trade secrets, confidential, and are valuable property of Allied, and any such information developed or used by the Employee during the course of his/her employment shall remain the property of Allied.
. . . .
 6. The terms, provisions and conditions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their successors, assigns and legal representatives; provided, that the Employee may not assign his obligations hereunder.
(Other portions of the agreement as they became relevant to the discussion will be set forth by the court in its decision.)
When Custard bought Allied it purchased all Allied's good will and assets, including any rights Allied had acquired under the foregoing agreement. Custard now seeks injunctive relief as provided for in that agreement. In interpreting the agreement, both parties agree that Massachusetts' law applies.
 (a)
The first question that must be addressed is whether Custard can enforce this agreement, is the agreement assignable? The defendant Nardi claims that: "Because the covenant is one for personal services by the defendant, it cannot be assigned for performance by the signatory company (here, Allied) to another company" (Custard), p. 23 of 7/16/99 brief.
The defendant cites the case of Reynolds Reynolds Company v. Hardee,932 F. Sup. 149 (E.D. Va., 1996). In that case, the defendant signed an employment agreement which contained a non-compete agreement and a confidentiality agreement as to customer records and information. The company for which the defendant worked was then bought by another company, the plaintiff, which purchased all the assets of the predecessor company which included any rights that company had acquired pursuant to the employment agreement. That new company terminated the defendant the same day it made its purchase and offered him a new contract of employment if he were willing to sign a more restrictive CT Page 5085-ed covenant not to compete. The defendant refused and the plaintiff said it intended to enforce the covenant in the employment agreement it had acquired. The defendant allegedly went into business on his own and acquired some of the plaintiff's customers. The plaintiff sued on its acquired covenant, but the court refused to enforce it, id., p. 151. The court reasoned that the contract was one for personal services, based on trust and confidence and was thus not assignable, in this diversity action, under Virginia law. Knowing the original employer, the employee, because of that knowledge and trust, had been willing to restrict future activities. The employee might not be willing to trust a stranger, id., p. 154. The court relied on the Vermont case of Smith, Bell Hauck, Inc.v. Cullins, 183 A.2d 528, 532 (1962).
But in its analysis, there are two factors that the defendant fails to take into account. For one thing, the agreement here contained an explicit provision that it was assignable. And also, knowing that, Nardi continued to work for Allied for 15 years and after the Custard takeover continued to work with the agreement in place for over two months. A later Vermont case, Abalene Pest Control Service, Inc. v. Hall,220 A.2d 717, 721 (Sup.Ct.Vt., 1966), where a successor corporation successfully sought to enforce a non-compete agreement, distinguishedSmith, Bell Hauck by pointing out that in the earlier case, the contract contained no provision for assignability. The issue turns on the intention of the parties when the original agreement was entered into between Allied and Nardi. At that time, Nardi signed an agreement with an assignability clause. Also, absence of an assignability clause will not prevent the new company from enforcing a non-compete agreement where the defendant employee continued to work for the new entity after the merger, accepting the benefits of the employment without objecting to the merger; Peters v. Davidson, Inc., 359 N.E.2d 556, 562 (Ind., 1977). Here, Mr. Nardi never voiced objection to the continued viability of the Allied agreement after the Custard takeover, he just did not want to sign the new Custard restrictive covenant agreement.
The Abalene case relied on a comment in Williston on Contracts, 3d ed., § 423, at pp. 141-142, which sums up the two factors just discussed:
 "423. Rights which would not otherwise be capable of assignment because too personal in their character and duties, the performance of which could not be delegated, may be assigned or delegated if the contract so provides, or if in the absence of such a provision the other party consents." CT Page 5085-ee
No Massachusetts cases are directly on point, but an older Massachusetts case, where a contract for personal services was not involved did accept the just quoted reasoning of Williston as to the effect of consent. See N.Y. Central Railroad Co. v. Central New EnglandRailroad Co., 162 N.E. 324 (Mass., 1928) (see headnote 8).
The court concludes that the agreement was properly assignable to Custard under Massachusetts law.
 (b)
The defendant claims the plaintiff's breach of the "employment agreement" nullifies the agreement and bars Custard from relying on it as a basis for injunctive relief. Breach by the employer is a recognized defense to the enforcement of an anti-competitive covenant. See generally, Causes of Action 2d, Vol. 11 (C.O.A.2d) "Cause of Action to Enforce Anti-Competition Covenant in Employment Contract," pp. 375, et seq § 3d, Ward v. American Mutual Liability Ins. Co., 443 N.E.2d 1342
(1983) and other cases cited by defendant to be discussed later in this decision.
The plaintiff seeks to dismiss this argument, and the Massachusetts cases cited by the defendant, by saying those cases are distinguishable because they generally involve breach of an employment agreement; this case merely involves breach of a non-compete agreement. For the court, at least, this is a distinction without a difference. The non-compete agreement here is introduced by "whereas clauses" which generally refer to the services Nardi will be hired for and in important respects define the terms and method of his compensation. In fact, a great part of the testimony in this case revolved around whether or not Custard materially and adversely affected Nardi's compensation after it bought out Allied, whether Custard merely instituted just a variation of Allied's former commission system, etc. Mr. Nardi was an at will employee; often such people work without formal, detailed written contracts. But this court cannot conclude that where the quid pro quo of a non-compete agreement is a certain referenced system of compensation, the Massachusetts courts will not protect employees from having such agreements enforced against them when, for example, the terms of the compensation system are radically altered.
In any event, was the imposition of the Custard plan a material breach of the understandings regarding compensation which the agreement and its acceptance by Nardi was based upon in 1982? CT Page 5085-ef
Massachusetts accepts the general rule "that an uncured, material breach by one party excuses the other party from further performance under the contract;" O'Connell Mgt. Co. v. Carlyle-XIII Managers,765 F. Sup. 779, 783 (D. Mass., 1991), however, "whether a breach is material is determined by the circumstances of each case." Id., p. 783; the court referred to the Restatement (Second) Contracts, § 241,Ward v. American Mutual Liability Ins. Co., 443 N.E.2d 1342, 1343
(Mass.App.Ct., 1983).
Under Massachusetts law, a material breach occurs when the breach is "an essential and inducing feature of the contract." Bucholz v. GreenBros. Co., 172 N.E. 101, 102 (Mass. 1930); Lease-It, Inc. v. Mass. PortAuthority, 600 N.E.2d 599, 602 (1992). This principle is applied to questions involving the enforcement of non-compete agreements. Ward v.American Mutual Liability Ins. Co., 443 N.E.2d 1342, 1343-1344 (Mass., 1983), and one would assume the confidentiality provisions of such agreements, cf. New England Canteen Service, Inc. v. Ashley, 363 N.E.2d 526,529 (Mass., 1997).
Turning to the agreement now before the court, the two "whereas" clauses set forth the consideration for the 1982 agreement. If they do not, why have them there, and if they do, how can it be said that they are not an "essential and inducing feature of the contract." The first whereas clause refers to the salary Allied was to pay certain and undefined "fringe" reimbursement.
The second whereas clause states "by accepting employment (Mr. Nardi) shall qualify for Allied's current commission program with the understanding that the guiding principles in regard to such commission program may be adjusted or modified from time to time at the discretion of Allied."
Much time was spent by both sides comparing Allied's program to Custard's, and discussing whether Custard's program imposed in 1997 was a "commission" program in the sense understood in 1982 when Allied used the term in its agreement. The difficulties, at least for the court, were compounded by the fact, for example, that there was no expert testimony presented projecting possible profit or rates of profit in the Northeast region which, under Custard's program, would dictate Nardi's possibility of getting a bonus, or the amount of any bonus and thus whether the representations in that regard were a charade. References were made to the Indiana region, a profitable area for Custard, to show that the northeast region would never generate sufficient profit to CT Page 5085-eg allow Mr. Nardi to earn anywhere near his Allied compensation. On the other hand, it was pointed out Indiana is a much smaller area of business opportunity than the Northeast and Custard is a national company so business could be poured into the Northeast region from other Custard offices greatly enhancing the net profit potential in the Northeast and thus the prospects for a good bonus for Mr. Nardi.
But the point is that "guiding principles" behind the Allied commission program was to give free reign to the talents of a person like Nardi. His monetary return depended on his own personality, talent and efforts, and those efforts were encouraged by the generous provision that his commission would be based on a percentage of the gross revenue he brought in yearly. Mr. Nardi is the type of individual who liked such a challenge and this is the compensation arrangement that was the inducement to his working for Allied and signing the agreement.
Custard's plan is conceptually entirely different, perhaps as fits a national concern. As noted, Nardi's "commission," "bonus," whatever word one uses, depended not just on his own productivity, efforts, personality, but on the success of the whole Northeast region which would, in turn, depend on fellow salespeople in the region and their productivity and on how much business could be funneled into the Northeast by other Custard offices. Custard's plan cannot be defined as a mere adjustment or modification of the Allied commission program.
To "adjust or modify" guiding principles is not to, in effect, abolish them. Allied drew this agreement up; if it wanted to provide that the "guiding principles" could be abolished or be subject to substitution by an entirely new commission or bonus plan it could have explicitly said so. The standard dictionary definitions of modify assume the continued existence of the subject matter exposed to the modification and most dictionary "definitions of adjust talk in terms of fine tuning, improving, making conformable too, Random House Dictionary, Webster's New Third International Dictionary, also see definitions especially of "modify" in Ballentine's Law Dictionary 3d ed.
Neither side could present an accurate picture as to what Mr. Nardi's earnings might actually be under the Custard plan as opposed to the old Allied plan, but the new plan, no matter how well intentioned it might have been or how beneficial to Custard, changed drastically the modus operandi of Nardi, the way he had worked for years and how he related to his employer and even fellow employees. In effect, the Custard plan substantially altered Nardi's expectations from those which he could reasonably have entertained when he signed this agreement with Allied in CT Page 5085-eh 1982. That Allied commission plan was the glue that bound him to Allied and made him perfectly comfortable accepting the restrictive covenants in the agreement. To paraphrase Kroger v. Stop Shop Co., Inc.,432 N.E.2d 566, 572 (Mass., 1982), it seems unfair to have Custard now come in, change the terms of how Nardi operated drastically and yet seek to enforce the restrictions in the agreement as to non-competition. The court would hold that the Custard plan was a breach of the Allied agreement in that it substantially changed its terms.
Having said all this, however, the court concludes that Nardi cannot take advantage of this substantial change in the agreement. The court could find no Massachusetts cases directly on point; that is, involving non-compete agreements. However, from other jurisdictions two cases are illustrative of the waiver concept involved as regards non-compete agreements. In Long v. Huffman, 557 S.W.2d 911 (Mo., 1977), the court reasoned that even if the employer breached the employment agreement, the defendant could not rely on the breach to avoid enforcement of the non-compete agreement. The court noted the defendant was aware of the breach but continued to perform under the contract and his continued performance induced the employer to pay him. A person who accepts benefits may be estopped to question the validity of the contract from which they derive, id. p. 915. Also see Moore v. Dover VeterinaryHospital, Inc., 367 A.2d 1044 (N.H. 1976). There, the court rejected the defendant's claim that a material breach by the employer, failure to fully staff office as agreed upon, did not excuse the plaintiff from contract compliance by him, i.e. compliance with non-compete agreement. The defendant acquiesced in the situation and continued to perform and receive payment. The court cited 3A Corbin, Contracts, § 755 (19960), "Waiver by Continuing to Perform or to Receive Performance." There are no Massachusetts cases the court is aware of that apply the waiver principle to non-compete agreements but that state certainly accepts the principle of waiver, see White v. Burger, 368 N.E.2d 824, 825 (1977);Craig v. Lane, 98 N.E. 685 (Mass., 1912). Also Steranko v. Infurex, Inc.,362 N.E.2d 222 (Mass., 1976), made clear that if the employee breached its agreement by reducing the plaintiff in rank this would be a breach of the employment agreement, but also concluded there was no waiver of his right to rely on the breach because of his delay in seeking relief by way of declaratory judgment for one month. This indicates Massachusetts courts would recognize the waiver concept in this area under appropriate circumstances.
Here, in late August, Mr. Nardi was informed about the change regarding Allied commission policy. He chose to stay on with Custard and receive compensation from that company. He could not claim, as the employee did in Steranko, see 362 N.E.2d at p. 230, that there could be CT Page 5085-ei any confusion about whether Custard's actions materially changed the Allied commission plan; it was obvious they did. Nardi himself testified he did his best for over two months to advance Custard's interests and comply with its policies. He himself said at one point to Mr. Shove as regards the new policy. "Let's see how it works out." Mr. Nardi has waived his right to rely on a breach of the agreement by the employer as a defense to the enforcement of the agreement.
 (c)
But Mr. Nardi's opposition to the enforcement of the agreement is not based just on a claim that Custard materially violated the terms of the agreement by changes in the method of compensation.
He appears to claim that his rank was reduced and his responsibilities and opportunities curtailed by Custard management soon after they acquired Allied. He was forced to share responsibilities with a man much younger than he who had the same rank in the Custard organization, assistant vice-president for marketing. At Allied he was the vice-president for marketing.
It has been held that an unjustified reduction in rank by the employer can constitute breach of an employment contract and can be used as a defense to enforcement of restrictive covenant. In Hensley v. E.R.Carpenter Co., Inc., 633 F.2d 1106, 1109 (C.A. 5, 1980), the court held that it was generally accepted by other jurisdictions that an unjustified reduction in rank would constitute a breach of the employment agreement. In Steranko v. Inforex, Inc. supra, the court held that "a material change in an employee's duties may constitute a breach of contract entitling the employee to damages," 362 N.E.2d at p. 230, also see Kravetz v. Merchant Distributors, Inc., 440 N.E.2d 1278, 1281
(Mass., 1982). Also Massachusetts reads a covenant of good faith and fair dealing into employment contracts even if they are at-will,Maldaloni v. Western Mass. Bus Lines, Inc., 438 N.E.2d 351 (1982). So it could be argued that his "reduction" in rank and the actions of Custard in not permitting him to go to an important Atlanta meeting with other Custard salesman violated such a covenant. Also, it would be difficult to apply a waiver argument Nardi based on his continuing to work for Custard since, unlike the abolishment of the Allied commission program, the deleterious actions being discussed were incremental and might have caused a state of confusion in Nardi's mind about his true status at Custard, cf. Steranko, supra, at 362 N.E.2d p. 230. The court has problems with these arguments, however, because it concludes that Custard's actions in this regard do not rise to the level of a material CT Page 5085-ej breach. True, Mr. Nardi was "reduced in rank" to an assistant vice-president and shared his operational sphere with a younger man. But Custard is a national company and even Nardi expressed excitement at the possibility of being able to use his obvious talents on a national stage. He still had an executive position, reduced, but in a larger company. As to the Atlanta conference, the proferred reason for not permitting him to go was that he refused to sign Custard's more restrictive covenant not to compete. But the court has not heard any evidence or argument that the new Custard agreement is illegal, overly broad or unfair as an agreement. And the record, briefs and oral arguments make clear that Mr. Nardi's counsel have mounted a broad based attack on the enforceability of the Allied non-compete agreement including attacks on its assignability lack of enforceability due to failure to specify work location, etc. Given this, it would be hard to argue that Custard's decision not to have Mr. Nardi go to the Atlanta conference without signing a new non-compete agreement was inappropriate, let alone made in "bad faith".
 (d)
The defendant also advances another argument for his position that the agreement cannot be enforced — the manner in which he was terminated.
Massachusetts apparently follows the view of those states which hold that even as to an at-will employee, the courts will refuse to enforce a non-compete agreement where the employee was unfairly terminated. When the employee's termination was arbitrary, capricious or in bad faith (the court) can `lend the hand of equity' in refusing to enforce the (non-compete) agreement." Empire Gas, Inc. of Koscuiko v. Bain,599 So.2d 971, 975 (Miss., 1992), cf. Rao v. Rao, 718 F.2d 219, 224 (CA 7, 1983). Massachusetts appears to adopt this position in EconomyGrocery Stores Corp. v. McNamy, 195 N.E. 747, 748 (1935), this case is cited with approval in Kroeger v. Stop Shop Co., Inc., 432 N.E.2d 566,572 (Mass., 1982). Ward v. American Mutual Liability, 443 N.E.2d 1342,1343 (Mass. 1983) indicates that in this area a "bad faith" test is to be applied which finds its genesis in Fortune v. National Cash RegisterCo., 364 N.E.2d 1251, 1255 (Mass., 1977). "Bad faith" is difficult to define and can range far and wide but unless it is to be held to eviscerate employments at-will doctrine, which Massachusetts purports to still follow, careful limits must be placed upon the concept of bad faith. In Grain v. Liberty Mutual Insurance Co., 429 N.E.2d 21, 25 (Mass. 1981), a finding of "bad faith" does not appear to mean a lack of good cause, but requires an affirmative showing that the employer acted with CT Page 5085-ek malice and dealt unfairly and acted in bad faith in discharging the employee. In Fortune v. National Cash Register, supra, "bad faith" was found where the company's firing deprived the employee of compensation he was on the brink of earning due to the completion of a sale — in effect, there was an unfair depriving of a commission that for all practical purposes had been earned. 364 N.E.2d at p. 1256. On the other hand, in Kroeger v. Stop Shop Companies, Inc., supra, the employee was let go because the new boss had a different marketing philosophy and the personalities of the boss and the plaintiff were dissimilar. In a passing reference, the court held that there was no evidence the defendant acted in bad faith or with an ulterior motive in discharging the plaintiff. 432 N.E.2d at p. 527. In Grain v. Liberty MutualInsurance Co., supra, the employee was terminated for the reason that he violated company policy regarding mailings to customers. The court said actual malice must be found and it could not be inferred from an allegation that the supervisors who fired the plaintiff did not want to work in the same office thus implying they did not like him. The employee argued the stated reason for firing him was "incredible" but the court reasoned the stated reason was not invented after the discharge. Malice does not equate with "negligence" or sloppy and unfair business practices or apparently with failure to conduct an adequate investigation, 429 N.E.2d at pp. 24-25. Economy Grocery Stores Corp. v.McNamy, supra, appears to take a broader view than the just discussed cases and noted the employee built up the business and was fired for no apparent reason after he refused to sign a non-compete agreement. He performed his work "faithfully" and "his services were in every respect satisfactory." But the court noted he was fired in a humiliating way and added that in the 1935 scenario of this case "possible hardship may result to the defendant if, in a time of business depression like the present, he is deprived of an opportunity to work. The public interest may be adversely affected by such a course when there are many unable to secure employment." Id., 195 N.E. p. 749. Frankly, the court does not know how to weave such ad hoc reasoning into its decision apart from speculating Massachusetts view might be different in rosier times such as this.
Looking at the facts here, was there evidence of "bad faith" in the way and in the very fact that Mr. Nardi was discharged? The court will examine the termination and the possible reasons for it from various points of view.
Termination is never a pleasant experience but there was no actual humiliation in the sense that Nardi was fired in a public setting for example. A company executive drove to his home to inform Nardi of the CT Page 5085-el company's decision.
Could age have been a factor in his discharge; he was given the same rank as was given the younger person in the same region. But Nardi was 47 at the time of these events. Mr. Shove, who testified extensively in these hearings, is a high Custard executive and he is well past the first blush of youth. The age factor is peculiarly pointless in this context as a motivation for firing Nardi because the very length of time he dealt with major customers and the long term relationships and even friendships he established over the years were what made Nardi a valuable asset to Allied in the past and makes him such a threat to Custard now. There is no evidence that Nardi was replaced by a much younger addition to the Custard staff nor was their any evidence that Mr. Arens, the youthful Custard assistant vice-president he was to share responsibilities with, was so successful and such a ball of fire that Custard expected him to match and/or exceed Nardi's productivity. No snide reference to age directly or indirectly were brought to the court's attention.
As to concerns Mr. Shove raised about not being able to locate Nardi, reaching him at a laundromat, suspecting he was putting in for too much in the way of expenses — the court concludes there is no substance to these suspicions. The court is convinced that Nardi is an extremely proficient sales person — that is one of the reasons why we have this case and why Custard has spent so much time, money and effort in prosecuting the case. It is hard to conceive that this man would not seriously devote his efforts to being as productive as possible for his own benefit. Nardi's explanations on these matters were convincing to the court. But this does not translate into a finding of "Bad Faith". The court, rather, believes the investigation and suspicions were based on sloppy investigation and unwarranted inferences but they do not suggest a pretextural basis for Nardi's firing. Custard could have fired Nardi for no reason at all.
Furthermore, there is no evidence of a grand plot or a series of incidents from which this court could infer a bad faith firing. As late as October 24th, two high Custard executives, Shove and Hubbard, went to a meeting with Nardi to try to retain a very important Allied Custard client HARRG. There was much evidence presented that Mr. Shove made repeated and numerous attempts to try to get Nardi to agree to sign the new Custard non-compete agreement. The court is prepared to accept that his failure to sign the agreement contributed to the decision to fire Nardi; at the very least, his delay in coming to a decision certainly must have ruffled feathers at corporate headquarters. But the court CT Page 5085-em cannot say that this would amount to a bad faith reason to fire — Custard had business reasons for wanting Nardi to sign the new agreement, Nardi may have good reason not to sign it, but no evidence has been presented that the agreement violated Massachusetts law or was otherwise illegal, inequitable or so unfair as to turn the pressure to sign it by Mr. Nardi a "bad faith" act.
It seems to the court a part of the reason that Nardi was terminated was a personality clash between Nardi, Shove and Custard. Mr. Nardi is alleged to have made a remark about whipping Mr. Custard into shape just as he did Mr. Hubbard at Allied. The court is sure that this did not sit well with Custard management which from Mr. Shove's testimony the court gathered regarded Mr. Custard with quite a deferential attitude — he was the president of a large and successful national company, Nardi was an employee of a much smaller operation albiet a valuable employee, but Custard wanted to run Allied as it saw fit and did not expect its employees to talk down to the boss.
This personality clash type of evidence as a reason for termination, however, does not rise to the level of "bad faith" under Massachusetts case law. See Kroeger v. Stop Shop Companies, Inc., supra. The court cannot accept the position that the agreement cannot be enforced due to bad faith termination.
 (e)
The court will now turn to the restrictions set forth in the agreement to see if they constitute an obstruction of the public interest and whether the agreement is otherwise an enforceable contract applying ordinary principles of contract interpretation. Under Massachusetts law, non-compete and confidentiality agreements will be enforced if they are not too broad and if they serve to protect legitimate business interests.New Enaland Tree Expert Co., Inc. v. Russell, 28 N.E.2d 997, 1000 (Mass., 1940); All Stainless, Inc. v. Colby, 308 N.E.2d 481, 485-486 (Mass., 1974).
As to the non-solicitation or non-compete portion of the agreement (paragraph 1), there is great dispute as to whether Mr. Nardi's office, for purposes of the agreement, is to be taken as being in Needham, Massachusetts or Orange, Connecticut. This has important consequences since major accounts that were Allied accounts were located within fifty miles of Orange, but not Needham. The court will address this issue shortly. CT Page 5085-en
But there has been no claim of unreasonableness concerning the limitation on solicitation to a fifty mile radius from whatever office is applicable. The plaintiff has cited cases indicating that a fifty mile radius would be acceptable under Massachusetts law, see MarcainCorp. v. Orchard, 885 F. Sup. 294, 299 (D.Mass., 1995); MarineContractors v. Hurley, 310 N.E.2d 915 (Mass., 1974). This is especially so under the facts of this case; testimony was received indicating that there are numerous, perhaps in the hundreds, sources of adjustment businesses throughout the country.
As to a two year limitation on solicitation, the court notes that paragraph 3 states that a court enforcing injunctive relief can reduce the time limit barring competition and this would not affect the validity of the agreement. The court believes it will be more appropriate to discuss the time limitation issue in the section of this decision dealing with remedies.
 (f)
As noted, there has been much dispute over the alleged vagueness and, therefore, unenforceability of this contract based on a claim that the office from which the agreement's fifty mile limitation on Nardi's ability to solicit and compete is never specified or indicated. The issue this claim raises is analagous to the "omitted term" problem dealt with in Restatement (Second) of Contracts, § 204 (1981). A federal case applying Massachusetts law has the following relevant comments to make:
 "It is a fundamental principle that a contract is to be construed as meaningful and not illusory. As the court said in Clark, 270 Mass. at 153, 169 N.E. 897; "The construction of a written instrument to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end."
 It is true that contracts cannot be rewritten simply to "rescue a firm from a sinkhole of its own design." See RCI Northeast Services Division v. Boston Edison Co., 822 F.2d 199, 205 (1st Cir. 1987). Adding a whole new provision is normally permissible CT Page 5085-eo only when additional terms are "essential to a determination." Fay, Spofford Thorndike, Inc. v. Mass. Port Authority, 7 Mass. App. 336, 343-44, 387 N.E.2d 206, 210 (Mass.App. 1979); D. Federico Co. v. New Bedford Redevelopment Authority, 723 F.2d 122, 129 (1st Cir. 1983); Restatement (Second) of Contracts, § 204 (1981)." Cofman v. Action Corp., 958 F.2d 494, 497 (A1, 1992).
 See also generally, The Law of Contracts Calamari 
Perillo, Fourth Ed., § 3.14.
Fourth Edition." Calamari, at p. 158 suggests that where the parties did not make provision for a term covering a situation extrinsic evidence may be received. Community standards of fairness and policy are taken into account. In any event, this court has no reason to believe in light of Cofman that Massachusetts courts would not follow the eminent reasoning of Barco Urban Renewal corp v. Housing Authority, 674 F.2d 1001,1007 (CA 3, 1982).
 "Terms are implied not because they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them. . . . or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable men (sic), presumably would have agreed on if, having in mind the possibility of the situation which has arisen, then contracted expressly in reference thereto."
As said in Radio Corp of America v. Raytheon Mfg. Co., 14 N.E.2d 141,143 (Mass. 1938).
 "[A] legal instrument is to be construed with reference to all of its language and to its general structure and purpose and in the light of the circumstances under which it was executed. These factors may qualify and control the literal signification of particular terms and phrases as effectually as if express qualifying words were found in the instrument."
The purpose of the office location clause was to ensure that Allied CT Page 5085-ep employees or former employees not solicit customers within a fifty mile radius of their assigned offices because the proximity of such customers to the employee's base of operations would give the employee an unfair advantage in competing for their business. Proximity affords the opportunity for closer and more frequent contact from an office, which, after all, the employer designated, set up and paid for. That would appear to be a protectible interest. By the same token, the employer could not fairly say that there should be no competition within fifty miles of any of our offices — that would be going too far since it is difficult to see what employer interests in that type of limitation would out weigh the employee's right to make a living.
Allied had several offices in several states as did Custard when it took over Allied. Needham was the main headquarters of Allied but Allied had to have these agreements apply to a fifty mile radius from where the employee was to work — that is where it needed and could reasonably ask for protection. The parties as reasonable people must have understood this — a 50 mile limitation from Needham, if that's not where the employee worked, would be meaningless to the point of being silly. That would be so because it would give the employer no real protection — presumably someone working in an Allied office miles from Needham would have few or no customers in the Needham area and Allied wanted and only justifiably could have an interest in preventing an unfair solicitation within fifty miles from the office where the employee worked.
Relying on the reasoning of the just cited cases, the court cannot accept the vagueness argument. These parties, as reasonable people, must be taken to have understood that the operative office for purposes of contract enforcement would be the office the employee was assigned to and worked from. So either the "sales office served or supervised by the employee" should be read to mean the Orange office or the court will read that designation into the contract as an implied term, cf. Cofman v.Action Corp., at 958 F.2d p. 498.
The court's reliance on general case law is appropriate because although many states, including Massachusetts, view these type of agreements with a wary eye, the court is not aware of any general warrant under the Massachusetts cases for trial courts to not apply general rules of contract interpretation to non-compete agreements. If so, how is the result on one case to be distinguished from that of another except by reference to the personal whim of trial judges — not a happy result. CT Page 5085-eq
But the defendant does not rely only on a vagueness theory. Regarding office location under paragraph 1 of the agreement, the defendant makes another contention. The argument seems to be made that, even if the paragraph 1 of the contract is not unenforceable because of its vagueness or imprecision in locating the office from which the fifty mile radius runs, that office would have to be the Needham office.
It is argued Nardi's work was regional and not limited to any particular sales office, thus his expenses were assessed to the Needham office; sales meetings took place in Needham; some of Custard's own documents list Needham as Nardi's office. And, the argument follows that since the "plaintiff has failed to prove Nardi solicited customers within fifty miles of the Needham office . . . Nardi did not violate the terms of the covenant not to compete," p. 35 of 7/16/99 Brief.
The latter argument, in fact, if anything, is good reason to interpret the agreement as having to apply to the Orange office. Nardi may have had regional responsibilities but for reasons previously discussed, the only reasonable place to apply the 50 mile limit would be to the office from which he actually worked. To say the limit applied to an office from which he did not actually solicit business but was merely corporate or regional headquarters would not be a reasonable expectation of the parties because it would render the agreement meaningless.
The following examination by plaintiffs counsel of Mr. Nardi on January 27, 1999 (p. 153-154) is quite illuminating on this issue of whether Needham was Nardi's office for the purpose of the agreement.
"Q. Mr. Nardi on direct you were saying that if an injunction issued from a fifty mile radius of the Orange office, it would really prevent you from working but if an injunction issued fifty miles from the Needham office, it really wouldn't impact you. Do you recall that?
A. Yes.
Q. You said the reason is because you were based in Connecticut and that's where your contacts were. Do you recall that?
A. Yes. My older contacts because I spent more time with them."
Nardi worked out of the Orange/West Haven office prior to the Custard takeover and that was his office for the purposes of Custard — he was told to report there. He tried to qualify the implications raised by CT Page 5085-er this fact by saying he always reported to the Needham office but with Allied he only had sales meetings every six weeks in Needham. They were more frequent with Custard but that is not surprising since Needham was the regional office and there had just been a takeover so more organizational meetings would be required. Nardi said he physically worked out of both offices and he would tell people that. But in an earlier deposition, Mr. Nardi had said he had been assigned to the West Haven/Orange office. The evidence is clear to the court that the office out of which he did his business, made his sales and made his contacts was the Orange office. That type of activity is the inducement or reason why Allied would want a fifty mile limit from that particular office. The fact that expenses were assessed to Needham, frequent meetings with supervisors or other sales people occurred there is largely irrelevant — these kinds of activities do not establish Nardi worked out of Needham for the purpose of soliciting business and that is not the locus from which Allied needed and could fairly demand protection. In fact, for all the verbal gymnastics that occurred here, Nardi never explicitly said he solicited business out of Needham — the court suspects the reason for that is that he never did and, although his parrying revealed Mr. Nardi to be an extremely intelligent witness, he was not a dishonest one.
The court concludes this agreement is enforceable as to the non-compete and non-solicitation provisions in paragraph 1 and for the reasons discussed in the section on breach of the duty of loyalty has concluded that Mr. Nardi did solicit Allied-Custard customers within a fifty mile radius of the Orange office to which he was assigned and out of which he worked. The court will discuss the appropriate orders to be made in light of this finding in the remedies section of this decision.
 (g)
The court must now discuss whether the defendant violated paragraph 2 or what the parties have characterized as the confidentially provision of the agreement. The agreement provides that all information used by Nardi in soliciting clients, including names of Allied clientele and personnel of such clientele, "are trade secrets, confidential and are valuable property of Allied." For the purposes of this proceeding, the information claimed to be "confidential" or "trade secrets" are the so-called contact people at various Custard-Allied customers, the Custard-Allied pricing schedules for customers and customer lists.
In regard to customer lists, pricing information and contact personnel at Allied-Custard clients, the court will not analyze this under the CT Page 5085-es trade secret language of the agreement in this section of the opinion. Since the court concludes that CUTSA applies, it will address the trade secret aspect of the case in that discussion. If the court were to conclude there that this information was a "trade secret" it could provide a remedy under CUTSA and/or under the terms of this agreement, paragraph 2. This is a permissible approach and there would be no analytical overlapping here. It is true that the agreement must apply Massachusetts law and that state has not adopted the Uniform Trade Secrets Act, our § 35-50 et seq., see 1999 pocket part of Vol. 15 of Conn. Gen. Stat. Annotated and list of states which have adopted act, p. 78. However, Massachusetts does follow common law on trade secrets, seePicker Intern Corp. v. Imaging Equipment Services, Inc. 931 F. Sup. 18,23 (D.Mass. 1995) and reliance on Restatement and Torts, § 757 (1939), aff'd. 94 F.3d 640 and the Uniform Trade Secrets Acts essentially "codifies the basic principles of common law trade secret protection, preserving its essential distinctions from patent law" prefatory note to Uniform Trade Secrets Act, see Uniform Laws Annotated,
Vol. 14 at p. 434.
But in addition to using the language "trade secrets" in paragraph 2 of the agreement, the employer Allied also said the "property" it defined in that agreement was "confidential . . . and valuable property of Allied."
There is some indication in case law from other jurisdictions that, even if certain employer information is not a "trade secret" the parties can agree that it is "confidential" between themselves, thus allowing the employer to protect itself beyond the ambit of formal trade secret law, cf. Inland Rubber Corp. v. Helman, 237 So.2d 291, 295 (Fla., 1970),Office Mates 5, North Shore, Inc. v. Hazen, 599 N.E.2d 1072, 1084 (Fla., 1992), cf. NHC Corp. v. Bruyles, 749 F.2d 247, 253 (C.A. 5, 1985, diversity case applying Louisiana law). The problem is that when these cases are read closely the test they use to decide if information is confidential" is analogous to the tests used to determine if something is a trade secret.
In any event, under Massachusetts law where the list of purported "confidential" information is so broad and generic as is the case here — "brochures, sales pamphlets and names of personnel of Allied's clientele" — then the non-disclosure agreement can only affirm the intent of the parties to be bound . . . by the common law of trade secrets. Dynamics Research Corp v. The Analytic Scienes Corp.,400 N.E.2d 1274 (1980), citing Motorala, Inc. v. Fairchild CameraInstruments Corp., 366 F. Sup. 1173, 1185 (D. Ariz., 1973). The uniform CT Page 5085-et Trade Secrets Act, as noted, is a codification of the common law — in large measure at least. Therefore, the court will analyze the issue of whether the matters claimed to be confidential are in fact trade secrets in the section of this decision discussing the alleged violation of Connecticut's Trade Secret law. If the material is not entitled to trade secret protection under the uniform act, the court is not aware of any argument that could make it a "trade secret" for the purposes of this agreement under Massachusetts law.
 BREACH OF DUTY OF LOYALTY A.
The plaintiff claims that the defendant violated his duty of loyalty toward Custard while he was an employee. The broad principles on which this claim is advanced are set forth in § 210 of the Am.Jur.2d article on Agency in volume 3. There, it says:
 "An agent is a fiduciary with respect to the matters within the scope of his (sic) agency. The very relationship implies that the principal has reposed some trust or confidence in the agent and the agent or employee is bound to the exercise of the utmost good faith, loyalty and honesty toward his (sic) principal or employer."
Both Connecticut and Massachusetts ascribe to this broad definition of the duty of loyalty owed by an employee to his or her principal. Town Country House Homes Service, Inc. v. Evans, 150 Conn. 314, 317 (1963);Doujotos v. Leventhal, 171 N.E. 445 (Mass. 19). Connecticut and Massachusetts counts both turn to the Restatement (Second) Agency to define the creation and scope of the agency relationship and the nature of the fiduciary duty. See Town Country House Homes Service, Inc. v.Evans, supra; Santangelo v. Middlesex Theater, Inc., 125 Conn. 572, 578
(1939); Beckenstein v. Potter Carrier, Inc. 191 Conn. 120 (1983). InChelsea Industries, Inc. v. Gaffney, 449 N.E.2d 320, 326 (1983), the count said: "Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer," citing § 387 of the Restatement, cf. Gagnon v. Coombs654 N.E.2d 54, 60-61 (Mass.App.Ct., 1995). Massachusetts has apparently incorporated portions of the Restatement into its statutory law, see Canney v. City of Chelsea, 925 F. Sup. 58, 62 (D.Mass., 1996).
The court, in analyzing this claim, has no reason to believe the CT Page 5085-eu courts of our state and Massachusetts have a different notion concerning the fiduciary duty of employees and the nature of that duty in a case such as this. The duty of loyalty is defined in §§ 387 through 398 of the second Restatement on Agency. The first edition of that work came out in 1933. As noted in the introduction to the second edition, additions have been made to the rules but few changes have been made in those rules. Thus, cases from other jurisdictions are relevant on the issue of the duty of loyalty and what it entails especially insofar as those cases also rely on the Restatement which in turn rests on long standing common law foundations.
How is the duty of loyalty defined and what are the reasons for imposing such a duty on employees?
Comment (e) of § 393 of the Restatement (Second) Agency sets the framework of the problem facing the court. There, speaking of an employee or agent, it says in relevant part:
 Even before the termination of the agency, he (sic) is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.
 The limits of proper conduct with reference to securing the services of fellow employees are not well marked. An employee is subject to liability if, before or after leaving the employment, he causes fellow employees to break their contracts with the employer. On the other hand, it is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm at the end of the period specified in their employment contracts. However, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the CT Page 5085-ev employer an opportunity to hire and train replacements.
 Illustration:
 1. A is employed by P as manager for a year. Before the end of the year, A decides to go into business for himself in anticipation of this and without P's knowledge, he contracts with the best of P's employees to work for him at the end of the year. At the end of the year, A engages in a competing business and employs the persons with whom he has previously contracted. A has committed a breach of his duty of loyalty to P.
Many cases on this problem are collected in 19 C.O.A. 745 (C.O.A. stands for "cause of action.")
This "sometimes — maybe" analysis reflects the underlying policy considerations in this area. First, the court will discuss these general policy considerations which hopefully will give a framework to the cases. Then the court will try to discuss the cases as they bear on the issue of the duty of loyalty trying to first discuss Connecticut and Massachusetts cases. Then the court will, apply what it can gather from the case law to the facts of this case as it finds them.
The general principles which the Restatement sets forth appear to be based on the requirements of the competitive model. In other words, it is posited in our system that independent businesses, the more the merrier, competing with each other, will ultimately provide to consumers products and services at the lowest possible cost. In order for this model to work, each of the independent competitor entities have to be guaranteed a certain amount of integrity, that is, freedom to operate to the best of their ability with the employees they have selected, without the type of interference by competitors that has nothing to do with efficiency of operation. Similarly, companies have to be able to rely on the loyalty of their employees while these people are working for them or it is difficult to see how companies could rationally and efficiently compete. That is why I suppose we have law on trade secrets, enforcing restrictive covenants, and more to the point, imposition of a duty of loyalty on employees while still working for a business. If such a duty were not imposed, success as between competitors would not depend on market place efficiency by people working to the best of their ability for a particular firm. It would depend on back room deals, sabotage of CT Page 5085-ew competitor operations and inefficiencies of operation by people who would not be concerned with delivering an honest day's work for an honest day's pay (to coin a phrase), but in getting the best deal for themselves while still collecting a pay check from the old boss — hardly a way to ensure the most efficient operation of the old boss' business.
On the other hand, absolute and rigid restrictions on the ability of employees to explore new business opportunities while working for a company would be unfair to the employees and limit opportunity to increase employee prospects (i.e. earn more money in better conditions). It would also be systemically harmful because it would stifle the long run development of more vigorous competition.
What do the cases say about and how do they define the duty of loyalty? How do they strike a balance between the just mentioned considerations? The count will now make some general observations about the case law in this area to set a framework for the ensuing discussion and factual background. Later it will make a more detailed analysis of the cases.
Very broadly speaking, while one is employed by one company, it is not permissible to solicit that company's customers for a rival business.Town Country House Homes Service, Inc. v. Evans, 150 Conn. 314, 317
(1963); Holiday Food Co. v. Moore, 37 Conn. Sup. 545, [Holiday Food Co. v. Munroe, 37 Conn. Sup. 546], 549 (App.Div.Sup.Ct., 1981); DelreAssociates v. Adkins, et al, 13 CLT 46, p. 1093 (1987); ChelseaIndustries, Inc. v. Gaffney, 449 N.E.2d 320, 326 (Mass., 1983), cf. SHVCoal, Inc., et al v. Wingrove, 545 A.2d 917, 920 (Pa., 1988); ABC Trans.National v. Aeronautics Forwarders, 413 N.E.2d 1299, 1306 (Ill., 1980).
Under certain circumstances, which will be discussed, it is also a violation of the duty of loyalty to encourage or arrange for fellow employees to work for a competitor or a rival business one intends to establish while still working for a company that will be the subject of this competition, BBF, Inc. v. Germanium Power Devices Corp.,430 N.E.2d 1221, 1225 (Mass., 1982); Sperry Rand Corp. v. Rothlein, etal, 241 F. Sup. 549, 563 (D.Conn., 1964); cf. Electronic Associates,Inc. v. Automatic Equip. Development Corp. 185 Conn. 31, 36 (1981); also see Nichols Morris Corp. v. Morris, 174 F. Sup. 691, 698 (S.D.N.Y., 1959); Chusid Co. v. Leeman Co., 326 F. Sup. 1043, 1060 (S.D.N.Y., 1971); Bancroft-Whitney Co. v. Glen, 411 P.2d 921, 935 (Cal., 1966);Dames Moore v. Baxter Woodman, Inc., 21 F. Sup.2d 817, 822 (N.D. Ill., 1998), see comment (e) of § 393 of Restatement (Second) Agency, CT Page 5085-ex supra.
One further general observation should be made. The cases in this area often make note of and therefore some importance appears to be attached to whether or not the former employee, accused of a violation of fiduciary obligations, was in an executive or managerial position, cf.Chelsea Industries, Inc. v. Gaffney, 449 N.E.2d 320, 362 (Mass., 1983); also see Electronic Associates, Inc. v. Automatic Equipment DevelopmentCorp., 185 Conn. 31, 33 (1981); National Rejectors, Inc. v. Trieman, etal, 409 S.W.2d 1, 37 (Mo., 1966).
The court will now try to address arguments that might and have been raised to argue against application of the duty of loyalty to this case.
The fact that the employee believes he or she is being shabbily treated or that business prospects do not look promising at the present employer does not excuse a violation of the duty of loyalty while the employee is receiving a paycheck. The solution in such circumstances is to quit the employment, not serve two masters by continuing to collect pay from the present employer while helping a competitor one hopes to work for or taking steps to foster a competing business one plans to set up by acts which are disloyal to the present employer. This appears to be so self evident that it is difficult to find numerous cases supporting such a notion.
In Sperry Rand Corp. v. Rothlein, supra, at 241 F. Supp., page 563, a case where the court found a breach of the duty of loyalty, the court said: "Although the defendants may have had some causes of complaint, at least in their own minds, because Sperry did not give them all they asked for and because Sittner was made head of the division, and although they had a perfect right to leave Sperry then and there, if they had chosen to do so, they elected rather to remain as employees of Sperry and on Sperry's payroll until they had made full preparations for the establishment of their own competing company. . . ." Nichols-MorrisCorp. v. Morris, supra, is another interesting case. There, the court also found that the defendant violated his fiduciary duty because of actions he took while employed at the plaintiff corporation. Prior to reaching this conclusion, however, the court engaged in a lengthy discussion of the factual background of the case, 174 F. Supp. at pp. 693-696. It is evident that the defendant had a long-running dispute with the co-founder of the plaintiff corporation concerning a stock buy out that the defendant believed seriously harmed his financial interests. The court did not factor this in when making its decision that acts of the defendant violated his fiduciary obligations. CT Page 5085-ey
The language in a trial court case, referred to by the plaintiff, should also be noted. There, the court said even where an employer materially breached an employment agreement, the employee "continued to have an obligation of good faith and fair dealing towards his employer and the traditional fiduciary obligations owed to any employer. Lantor,Inc. v. Ellis, 9 Mass.L.Rptr. 221 (Mass.Super., 10/2/98).
Any other position would eviscerate the duty of loyalty and give carte blanche to employees with any grievance to surreptitiously sabotage their employer prior to setting up a competing business or working for a competitor — so much for the benefits of independent competing companies efficiently vying with each other to produce the ideal economic model. And what are judges to do, pry about and see how bad the boss really acted; not too bad, pretty bad, bad enough to remove the duty of loyalty and bar any consequences for violating such standards?
The cases cited by the plaintiff for the proposition that an employee's duty of loyalty is abrogated or watered down while he or she remains employed, and if the employee is subject to unfair and even shabby treatment, are not on point.
For example, the defendant cites O'Connell Management Co. v.Carlyle-XIII Managers, Inc., 765 F. Sup. 779 (D.Mass. 1991), for the proposition that "[i]t is well settled that an uncured material breach by one party excuses the other party from further performance under the contract," id. p. 783. That time-honored principle of contract law allows an aggrieved party to walk away from the contract. It does not allow someone to maintain contractual relations and violate the basic requirements necessary to fulfill ongoing contractual obligations, i.e. the duty of loyalty in contracts of employment. True, as the defendant notes, Massachusetts reads an implied covenant of good faith and fair dealing on the employer's part in every employment relationship as we do.Cherick Distributors v. Polar Corp., 669 N.E.2d 218 (1996). But if the employer breaks the covenant it merely entitles the aggrieved worker to sue for money damages, the contract no longer being operative. The worker is compensated and hopefully the law, by opening the courts to redress, will deter future improper employer conduct. However, such a breach by the employer does not allow the worker to continue the relationship and breach the duty of loyalty giving the employer in turn no redress. If it did, employer-employee relations would degenerate into the law of the jungle.
The court also fails to see the relevance on this issue of the CT Page 5085-ez so-called "constructive discharge" cases cited by the defendant.Serrano-Cruz v. DFI Puerto Rico, 109 F.3d 23, 26 (Ca. 1, 1997);Camacho v. Sears Roebuck, 939 F. Sup. 113, 117 (D. PR, 1996);Zabielski v. Montgomery Ward Co., 919 F.2d 1276, 1281
(Ca. 7, 1990). These cases involve rights of action by former
employees who have been subjected to intolerable treatment prior to leaving their jobs. They say nothing about what the obligations of these employees would have been if they had stayed on at their jobs.
Finally, the defendant quotes the Restatement and a case which really support the view that the duty of loyalty remains while the employee keeps receiving a paycheck despite the treatment he or she had received. The Restatement (Second) of Contracts says at § 237, "It is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no material failure by the other party to render any such performance due at an earlier time." (Emphasis added.) This represents a device to escapefurther contractual obligations; if for some reason the party who is the victim of material failure decides to continue the contractual relationship, his or her duties continue to remain in place. Likewise, the defendant quotes from American Hospital Supply Corp. v. HospitalProducts. Ltd., 780 F.2d 589, 599 (Ca. 7, 1986) and states that case held "as a basic principle of contract law that if you commit a material breach of contract the other party can walk away from the contract without liability, and can do so as soon as you announce your intentions, even if the time for performance that you have repudiated hasn't yet arrived." Thus, the party who is the victim of the material breach can "walk away" from contractual obligations, that is, terminate the contract. Nothing in this principle, however, allows the "wronged" party to not "walk away" from the contract and, while choosing to remain in the contract, ignore or repudiate all the obligations he or she might have under the same contract.
The court will now discuss some of the more detailed predicate findings and factual assumptions that its legal analysis will rely upon. After this, the court will return to the case law, and then again, the facts it has found relating them more directly to the case law.
 B.
Mr. Nardi had an important executive position while working for Allied; he was vice president responsible for marketing mainly in New England, New York and New Jersey. When Custard took over Allied, he felt CT Page 5085-fa that he was demoted since he was to become an assistant vice president. He still was to have and did have while working for Custard an important executive position.
Custard took over Allied on September 1, 1997, and Mr. Nardi became increasingly concerned over Custard policies as they applied to him and to the general operation of the business insofar as he believed they would affect his business and financial prospects. He concluded that Custard's new policy regarding the compensation he was to receive would fairly substantially reduce his earnings from what they had been at Allied. Also, Mr. Nardi became worried about new pricing policies Custard wished to impose on customers. He concluded the price increases would result in the loss of several lucrative accounts he had developed, especially the HARRG account which had proved a very lucrative source of income to him over the years.
In late September or early October of 1997, he contacted John Markle, president of Mark Adjustment which competed with Custard in New York, New Jersey, Pennsylvania and parts of Connecticut. Mr. Nardi had worked with this company prior to beginning employment with Allied in the 1980s, and he discussed with Markle the possibility or prospect of his working again for Mark Adjustment. Some time shortly thereafter, Mr. Nardi discussed with certain Allied-Custard employees the possibility of their working with Mark Adjustment and arranged for them to meet with Mr. Markle. Mr. Nardi also had certain conversations with key customers of Custard prior to his termination in November of 1997 in which his possible switch to Mark Adjustment was discussed.
Mr. Nardi testified that he had not firmly decided to leave Custard and work for Mark Adjustment until November, 1997. The status of the HARRG account would be a determining factor in his ultimate decision, but as noted, he was terminated by Custard in early November.
In certain respects whether, in fact, Mr. Nardi really had or had not decided to leave Custard as late as November is important at least to the court, in attempting to characterize factually and legally the nature of his contacts with Custard customers and conversations with Allied-Custard employees in September and October about their continued employment with Custard and possible employment with a competitor. To address this question certain aspects of this business must be discussed. Mr. Nardi testified that in the property and casualty area, as opposed to trucking, which Custard had been heavily involved in, pricing was the major concern of companies seeking the services of adjusters like Custard or Mark Adjustments (Mark). However, pricing can hardly be the CT Page 5085-fb only concern. This is a highly competitive industry. There are few fixed contracts for long lengths of time between insurance companies and the adjusters who compete for their business. The court cannot believe that the insurance companies looking for adjustment services from Custard or Mark would not try to get the best price and this necessarily would result in at least general information about pricing being known in the market place as prospective customers try to bargain prices down. That being the case, factors other than pricing must also contribute to and be important to customer decisions about using the services of one adjustment company rather than another. That is exactly what the court concludes and what the testimony discloses here. A marketing person like Mr. Nardi would use his impressive business skills and personal rapport to attract customers in the first place. But an important component of retaining customers is how the newly garnered accounts are served. How quickly claims are processed and how efficiently they are investigated and finally disposed of by the particular adjustment company is an important part of the services competing adjustment companies offer. An important part of Mr. Nardi's skills was working with his adjusters to see that his clients' accounts were efficiently serviced. It follows then that the skill and work ethic of the adjuster is an important part of the capability of a marketing person like Mr. Nardi to attract and keep adjustment business. As indicated, shortly after meeting with Markle in late September, Mr. Nardi spoke to several adjusters about going to work for Mark. He told them Custard was planning to terminate some or all of them, said it would be a good idea for them to work for Mark. One of the reasons for all of this is that these adjusters had worked with him in handling Mr. Nardi's business at Allied. Much of this testimony comes from a prior deposition of Mr. Nardi which is of course an admission and which Mr. Nardi did not dispute factually when confronted with deposition quotes. One deposition question was "Did you feel that you would be more effective if these people were also aboard in obtaining business for Mark?" Mr. Nardi at the deposition answered "Yes." Almost immediately after this quote was read, Attorney Packtor asked in regard to this deposition exchange:
 "Q. Isn't one of the reasons why you thought you'd be more effective if these people were hired by Mark is because they handled your accounts at Custard? Isn't that correct?
A. Are you saying one of the reasons?
Q. Yes. CT Page 5085-fc
A. It's definitely possible.
. . . .
 Q. Was one of the reasons that you thought you'd be more effective?
A. I believe it was, yes."
Why on earth would Mr. Nardi be encouraging these adjusters to work for a competitor in late September or early October and throughout that month if he had any intention of staying with Custard? or to look at it from another perspective, given the fact of Mr. Nardi's intelligence and professional skills, both of which the count explicitly recognizes, why would he place himself in a position where he would not be working with the very adjusters whom he recognized as efficient servicers of his accounts and thus important resources in retaining his accounts? Posing the questions provides the answer. The court concludes Mr. Nardi wanted to leave Custard's employ from the time he had first spoken to Markle in early September and thereafter worked assiduously to achieve that end. With all these foregoing background factual assumptions and findings, let us examine what happened here. The court considers the two central concerns regarding the breach of fiduciary obligation claim to be (1) the encouragement of Custard employees to leave its employ and work for a competitor, Mark Adjustment; and (2) the allegation of solicitation of customers of Custard — both activities allegedly occurring while Mr. Nardi was still an employee of Custard. The court will address these two matters in light of its fact discussion and more specifically applicable case law.
 (1)
Earlier in this opinion, the court quoted from comment (e) to § 393 of the Restatement (Second) Agency. From reading numerous cases in this area, the court completely agrees with one comment statement: "The limits of proper conduct with reference to securing the services of fellow employees are not well marked." But the comment goes on to say that it is normally permissible for employees, while still employed, to agree that they will compete with the firm they work with after their employment contracts are over. This would also be true, of course, if the employees are at will. But the comment goes on to say that it may be a breach of duty for a number of "key officers or employees to agree to leave their employment simultaneously and without giving the employer an CT Page 5085-fd opportunity to hire and train replacements." The illustration is even more illuminating. The case is presented of a manager who decides to go into business for himself and without his employer's knowledge "he contracts with the best of (the employer's) employees to work for him (her) at the end of the year." (Emphasis added.) At the end of the year, a competing business is set up. The Restatement concludes that this would represent a breach of the duty of loyalty.
The cases generally go along with the views expressed in the Restatement and place limits on what an employee may do who plans to set up a competing business or work for a competitor while still on his or her present job. This especially appears to be the case if the employee is an officer or holds a management position.
Many cases hold it is a violation of fiduciary duty for a company officer to approach an employee for purposes of encouraging the employee to work for a competing business. Thus, in Electronic Associates, Inc. v.Automatic Equip. Development Corp., supra, no breach of fiduciary duty was found where a former employee of the plaintiff induced one of the plaintiff's employees to work with him at a competitor. The court said that: "In the absence of fraud, misrepresentation, intimidation, obstruction, molestation or malicious acts, courts generally recognize no liability for inducing an employee not bound by an employment contract to move to a competitor." The court went on to say that this "rule rests on the policies of encouraging full fair and free economic competition." 185 Conn. at p. 34. But, even though the defendant was not a director or officer of the corporation at page 36, the court significantly went on to say, "Merritt (the defendant) testified that he directly contacted Lund (the employee induced to work for the competitor). The plaintiff, however, concedes that this solicitation occurred after Merritt had left its employ. Once Merritt left the plaintiffs employment, no fiduciary duty restrained him from using ordinary methods to encourage his former coworkers or subordinates to follow him to its competitor." In Republic Systems Program, Inc. v.Computer Assist, Inc., 322 F. Sup. 619 (D.Conn., 1971) at page 626, the court said: "The evidence indicates that defendants (who were officers or had management positions) were aware that solicitation of other employees might be inconsistent with the fiduciary obligation they had while they remained as employees . . . and were careful to terminate their employment before embarking on any such solicitation." In that case, the defendants left the plaintiffs employ and set up their own competing corporation immediately thereafter, id. at p. 624, also seeDamer's Moore v. Baxter v. Woodman, Inc., 21 F. Sup.2d 817, 822, 823,826 (N.D.Ill., 1998), cf. Standard Brands, Inc. v. U.S. Partition CT Page 5085-fePackaging Corp., 199 F. Sup. 161, 165, 173 (E.D. Wis., 1961); FrederickChusid Co. v. Marshall Leeman Co., 326 F. Sup. 1043, 1059, 1060
(S.D.N.Y., 1971). The case of Bancroft-Whitney Co. v. Glenn, 411 P.2d 921
(Cal., 1961), citing comment (e) of § 393 of the Restatement (Second) Agency, had some interesting things to say at page 935:
 "There are only a few cases cited by the parties which involve the specific question whether an officer may offer employees of his (sic) corporation jobs with a competing enterprise he (sic) is preparing to join. These cases are not consistent in their results and appear to rest on general principles relating to the obligation of a fiduciary. . . . The mere, fact that the officer makes preparations to compete before he (sic) resigns his office is not sufficient to constitute a breach of duty. It is the nature of his (sic) preparation which is significant. No ironclad rules as to the type of conduct which is permissible can be stated, since the spectrum of activities in this regard is as broad as the ingenuity of man itself."
But the Bancroft v. Whitney court did go on to find a breach of fiduciary duty. One of the factors it considered was the following at p. 936:
 "The undisputed evidence shows a consistent course of conduct by him (the defendant Glen) designed to obtain for a competitor those of the plaintiffs employees whom the competitor could afford to employ and would find useful. If Glen, while still president of the plaintiff, had performed these acts on behalf of Bender Co. (the competitor) without also obligating himself to join the company, there could be no doubt that he would have violated his duties to the plaintiff. Surely, his position in this regard cannot be improved by the fact that he was also to be employed by Bender Co. and was to share in the profits of the new western division."
Also see Nichols-Morris Corp. v. Morris, 174 F. Sup. 691, 698
(S.D.N.Y., 1959).
Not all cases agree with the foregoing view. In Sun Life Assurance Co.CT Page 5085-ffof Canada v. Coury, et al, 838 F. Sup. 586 (S.D.Fla., 1993) the court purportedly relied on Florida law (of which more later) and granted summary judgment on behalf of the defendants. There, the defendants, who had management positions while still working for the plaintiff, and while having job applications with a competing insurance company arranged for a secret meeting between themselves and other employees regarding the possibility of working for the competitor. They also gave production and salary figures of their subordinates to the competitor. The court found no breach of fiduciary duty. It noted the defendants had not engaged in actual competition with the plaintiff-employer during his employment and after all the defendants and their fellow employees were only pursuing the possibility of employment with the competitor "but as a matter of law, they were not employees of (the competitor) and were not acting as (its) agents . . .", id. p. 589.
Oddly enough, the District Court explicitly relies on a Florida caseInsurance Field Services v. White White Inspection and Audit Service,Inc., 384 So.2d 303 (Fla., 1980) which does not appear to stand for the position set forth Sun Life Assurance. There, at 384 So.2d pp. 307-308, the court said:
 "While in the absence of an agreement, there is normally nothing improper with an agent or employee terminating the employment relationship and proceeding to compete with his (sic) former principal or employer, there nevertheless exists during the ongoing relationship a common law duty not to engage in disloyal acts in anticipation of future competition. Restatement (Second) of Agency § 393, comment (e). . . . Appellants (defendants) breached their duty of loyalty to the appellee (former employer) by securing the services of appellee's field agents and the business of appellee's customers prior to August 1, 1977, while still in the employ of appellee."
Another case seemingly agreeing with Sun Life Assurance is the case ofUnited Aircraft Corp v. Boreen, et al, 431 F.2d 694 (CA 3, 1969). There, the court upheld the District Count's conclusion that no breach of fiduciary duty was established. The court noted that the trial court found that most of the defendants while still employed by the defendant participated in the formation of a competing corporation and while so employed encouraged co workers to join this new corporation. One of the defendants was a corporate officer, it is unclear what the status of the CT Page 5085-fg other employees was. The court said this was not a problem since all were at-will employees and the mere act of preparing to compete violates no fiduciary duty. Id., p. 700. Despite this position, it is interesting to observe that the court did make a point of noting that the defendant, who had been instrumental in setting up the competing corporation, "offered" to have certain of the (other) defendants stay on with the plaintiff as long as they were needed. Id., p. 700.[3]
The court disagrees with Sun Life and Boreen and agrees with those cases which talk about the general duty of an officer or manager not to advise or encourage coworkers to leave their present employer to work for a competitor or a new company that the officer plans work for or run himself there are two subcategories of cases that can be considered together. But even if it is felt that it goes too far to have a blanket rule that it is a breach of fiduciary duty where an employees is approached by an officer to work for a competitor, there can be certain aggravating factors which would make such an action an unarguable violation of a fiduciary duty.
Thus, there are cases which find a breach of duty and mention situations where the employees encouraged to leave are key employees whose departure would severely harm the employer's ability to compete in a certain area or market. The employee-officer, who provides such encouragement, learns about the particular skills of such subordinates while working for his employer and if this individual engages in such activities while he still is employed by his or her principal, the ability to influence the subordinates who are approached might be considerably greater. Also one might add as an officer he or she learns of the special skills of certain employees on what can be called "company time". In ABC Trans National, et al v. Aeronautics Forwarders,
supra, the court found a breach of fiduciary duty where the defendants encouraged co-workers to leave employment and work for a competing company they had set up — all of this while they worked for the plaintiff. The court noted the plaintiff thereby suffered a crippling loss of customers and a substantial number of employees, 413 N.E.2d at p. 1306. In Sperry Rand Corp. v. Rothlien, 241 F. Sup. 549 (D. Conn. 1964), the court said from the time the defendants decided to set up the competing enterprise until they left their employment "they were serving two masters." Id., p. 563. At page 565, the count noted they did not solicit skilled employees elsewhere in the industry, but went after their boss's employees because they preferred those familiar with the employer's business. Id., p. 565. The court went on to say at the same page: "that the natural and logical consequence of what they planned to do and succeeded in doing would make a shambles out of their employer's CT Page 5085-fh semiconductor business appeared to be of little concern to them except it would help to destroy competition from Sperry (plaintiff-employer) while National (their business) was getting established." Also seeChelsea Industries, Inc. v. Gaffney, 449 N.E.2d 320 (Mass.Sup.Ct., 1983) defendants solicited major customers and sales personnel; court noted if the defendants and people they solicited left simultaneously without prior notice effect would be to leave plaintiff "without operational or sales leadership and thereby render it especially vulnerable to competition by the defendant's new business." Id., p. 324.
Applying the principles set forth in the Restatement and these cases the court concludes that Mr. Nardi violated his fiduciary duty in his approaches to his four subordinates. He informed them they were about to be terminated. As a company officer he learned this from other management officials and he had no authorization to communicate this to the employees he approached while he remained employed by Custard. Not only is the question of whether all of these people were to be terminated in issue, but also an employer has the right to determine when, how and under what circumstances it makes such a decision. It certainly is not appropriate to give such information to subordinates while at the same time advising them to try to seek employment with a competitor after having discussed with the same competitor that such action would be taken and arranging the meetings with the competitor's president. This is especially so since Mr. Nardi was in the process of deciding himself to work for the competitor, Mark Adjustment. These people were part of his "team" who would be useful for him to have at Mark because they enhanced his ability to serve key Custard customers who he hoped and planned to bring with him to Mark. Furthermore, even if the court is completely wrong in its conclusion that Mr. Nardi had decided to leave Custard prior to his termination and even if it is assumed that Custard had, in fact, decided to fire these people at some point in the fairly immediate future, Mr. Nardi's actions would still have constituted a breach of fiduciary duty. That is, his own effectiveness would have been undermined by encouraging these employees to go to Mark or elsewhere before he and Custard had a chance to train or otherwise provide replacements. Did Mr. Nardi, as an officer of this corporation, not have an obligation to discuss with his superiors options to ensure that he would have an adequate staff when these employees were forced out or to take steps himself to ensure that result? He certainly did not have the right to encourage them to leave for Mark or other employment forthwith. And leave they did all around the same time and coincidentally just about the time Mr. Nardi went to Mark. The net result of all this, as Mr. Shove, senior vice-president of Custard, indicated, was to leave a New Jersey and a New York offices CT Page 5085-fi virtually unmanned without the ability to compete for and/or retain certain business. The effectiveness of Mr. Nardi's efforts is indicated by the fact that although Custard does business with HARRG, an important source of business, in other parts of the country, Mark now has its business exclusively in the northeast region. It is true that morale was very low under the new Custard management. Custard had closed Allied offices and let go employees and planned to let go more of them. But Mr. Nardi was an officer of that corporation and whether to advance his own interests or out of a sense of loyalty to hardworking subordinates he could not continue to receive a Custard paycheck and take the steps that he did. His proper course of action would have been to resign, move to Mark and then solicit people he had successfully worked with at Allied. While he continued to work at Custard he could not put his efforts into arranging things so that when he went to work for Mark, he was in a position to best handle major accounts — major accounts which Custard could not, initially at least, compete for due, in part, to his actions. That Custard employee and pricing policy may have increased the risk that customers and important employees would go elsewhere, did not give Mr. Nardi the right to hasten that process while he was still a Custard officer. In other words, there is still a violation of fiduciary duty no matter what the effect of Custard policy may be on the nature and scope of any remedy. As a fiduciary, Mr. Nardi had a duty to either enforce Custard policy or try to advise his superiors against its deleterious effects or attempt to convince customers and select employees that even with those policies Custard was the company to stay with. If he, in good conscience, could not live with those options, he had one appropriate course of action — resign.
 II
As the Restatement makes clear in comment (e) to § 393, before the end of employment an employee may make arrangements to compete, or as the Restatement implies, even contact a competitor about the possibility of working for that competitor upon termination of employment. But such an employee, prior to leaving the employment, cannot solicit his employer's customers for a rival business he or she intends to set up or for the competitor he or she plans to work for once the present employment terminates. This requirement of fiduciary duty seems self evident and cases support this common law principle. Town CountryHouse Homes Service, Inc. v. Evans, 150 Conn. 314, 316, 317 (1963);Holiday Food Co. v. Munroe, 37 Conn. Sup. 546, 549 (1981). (App.Sess.Sup. Ct.); Delre Associates v. Adkins, et al, 13 CLT 46 (11/23/87); RepublicSystems Programming, Inc. v. Computer Assistance, Inc., et al,332 F. Sup. 619, 627 (D.Conn. 1970) (court found no violation of fiduciary duty because customers solicited after employment terminated); CT Page 5085-fjChelsea Industries, Inc. v. Gaffney, 449 N.E.2d 320, 326 (Mass.Sup.Ct., 1983); SHV Coal, Inc. v. Continental Grain Co., 5454 A.2d 917, 921
(Pa.Sup. 1988); ABC Trans National Transport v. Aeronautics Forwarders,Inc., 413 N.E.2d 1299, 1307 (Ill.App.Ct., 1980); Dames Moore v. Baxter Woodman, Inc., 23 F. Sup.2d 817, 824 (N.D.Ill., 1998).
The problem, however, is not quite so easy as the foregoing black letter law might indicate because the question becomes what it means to "solicit". Two older cases illustrate the problem. In Ellis MarshallAssociates, Inc. v. Marshall, 306 N.E.2d 712 (App.Ct. of Ill., 1974), the court upheld the trial court's finding that the defendant did not violate his fiduciary duty to his former employment prior to his resignation. The court concluded that the defendant did nothing more than inform certain clients of his intention to leave the plaintiffs employ. The defendant told one client a week and one half before his resignation that he very much wanted to represent them but was not pressing for an answer; he told another client that he would like to further discuss the relationship between his newly formed group and that client. The court did not regard these as "solicitations" which courts have regarded as violations of a fiduciary obligation. Id., pp. 715-717.
The Marshall court distinguished the case before it from Duane JonesCo. v. Burke, 117 N.E.2d 237 (Ct. of App. N.Y., 1954). In that case, the court found that the defendant employees had violated their fiduciary duties. In Duane Jones, the defendants planned two months before their departure to contact their employer's clients to try to seek a favorable reaction to their plan of either buying the employer out or forming a new competing business. Id., pp. 241, 245. The Duane Jones court found that at the time the defendants had presented the buy out ultimatum to their employer the clients had already been "pre-sold" on the plan. TheMarshall court, commenting on Duane Jones said in contrast in the case before it: "The defendant here did not ask the plaintiffs clients to approve his plan or even attempt at that time to persuade them to employ him in his new capacity." Id., p. 717.
What do the facts indicate here on the question of solicitation. The testimony of Mr. Nardi on November 17, 1998, is quite instructive. It indicates that in late September or early October, 1997, shortly after the Custard takeover, he called John Markle of Mark Adjustment and discussed the possibility of going to work for him. This was followed by a personal meeting where the same subject was discussed. There is certainly no problem with such preliminary discussions under the Restatement or any cases the court could find. But Mr. Nardi, in his meeting, went beyond that. He said he could probably bring four people CT Page 5085-fk who worked on his accounts at Custard over to Mark also. He later told one of these adjustors some client customers had already expressed interest in Mark. During the just mentioned meeting with Markle, Mr. Nardi also said he could probably bring some Custard customers over to Mark. During the trial of this matter Mr. Nardi denied that Markle told him to contact customers to see if they would be interested in making the switch to Mark. But at a deposition held prior to the hearing on this matter, he admitted as much. The court accepts the admission especially in light of the previously mentioned Nardi activity going on with Custard employees and the implications that can be drawn from it. And later in questioning at this hearing on November 17th, Mr. Nardi admitted he told Markle he would not mind working for him if things could be worked out — which meant "Finding out whether or not any of these clients were interested in giving work to Mark Adjustment."
Mr. Nardi testified he had ongoing discussions with a Mr. Sullivan of HARRG about his concerns over the Custard takeover. Mr. Nardi was then asked as to when he first talked to Sullivan about his possible move to Mark and about whether Sullivan wanted to switch his business to Mark. Mr. Nardi answered, "Well, it was very key to have him be involved. If he (Sullivan) wanted to give work to Mark, then that would help me make the change." He talked to Sullivan in October after negotiations between HARRG and Hubbard, Shove and himself broke down but while he was still employed by Custard. He then told Markle that HARRG would be interested in going to Custard's competitor Mark "if the pricing was in order" and Nardi admitted he told Markle "what kind of pricing would be necessary to get the HARRG account — he knew that because he had negotiated pricing on behalf of Allied-Custard. These conversations took place in early October or middle of October according to Nardi. He protested that this was after the Custard-HARRG negotiations broke down but the final meeting between him, Hubbard and Sullivan to save the HARRG account was October 24th. The serving two masters guidelines for fiduciary obligations is underlined at this point — Sullivan goes to a meeting arranged by Custard to keep the HARRG account, Nardi is present but all the while Sullivan and Nardi have been in touch with each other about Nardi's possible move to Mark, Sullivan's reaction to that and Sullivan's dissatisfaction with Custard. The violations of fiduciary obligations are obvious — Nardi went far beyond just communicating information about the possibility of a switch on his part to Mark. He was, upon Markle's direction and in his own interest, gauging Sullivan's reaction to such a move by him, soliciting Sullivan's business and giving pricing information to Markle to land the business. If Nardi was not trying to land the business for Mark, why give Markle pricing information about HARRG. CT Page 5085-fl
The testimony is even more explicit with Blue Ridge, another Custard customer, Nardi was asked:
 Q. " . . . In October shortly after your meeting with Mr. Markle, didn't you also speak with to Rich Abrams at Blue Ridge about sending his work to Mark?"
A. "Yes I believe so in so many words."
(and a little later,)
 Q. "And as a result of your discussion he said he would give you some files if you went out on your own or with Mark Adjustment. Isn't that correct?"
A. "Yes."
HARRG moved its business in the northeast to Mark even before Nardi was terminated from Custard and Blue Ridge went to Mark in December just when Mr. Nardi started for Mark.
The same testimony as to Blue Ridge was repeated as to two other Custard customers, Colonia and Claims Administration and they switched their business to Mark in November, 1997 about the time Nardi was terminated followed by his joining up with Mark.
Later in the hearing, Mr. Nardi tried to qualify his November 17th testimony or explain it in a light more favorable to his position in response to questions by his lawyer and the lawyer for Custard. He said he did not contact Sullivan about switching HARRG's business to Mark — it's not what he did, it's out of context. But he was then confronted with deposition testimony wherein he agreed he contacted the just-mentioned Custard customers while still working for Custard to see if they were interested in continuing with him if he switched to Mark. In fact, he talked to other Custard customers in late September, early October about going with him if he switched to Mark. Later he told Attorney Packtor that sometime in October he concluded he could line up enough business to make the change to Mark.
Under questioning by his own attorney, he said he spoke to Markle about working for Mark while still at Custard but he was "unsure (as) to what was going on" and he did not want to leave the Custard organization. He did not solicit business from Allied Custard customers while still CT Page 5085-fm working for Custard. He, in fact, was trying to keep the Blue Ridge account for Custard and he certainly did not solicit their business or that of Carolina or Claims Administration for Mark. These companies were not satisfied with the Custard takeover of Allied and Sullivan of HARRG was not willing to accept the Custard price increases. Continuing with qualifications of previous testimony Nardi even said he did not follow through with Markle's request to line up business, i.e. current Custard customers whose willingness to switch to Mark Adjustment would allow his own move to Mark. That would be "soliciting" and improper. In fact, when he used the word "line up" it had a different meaning entirely from "soliciting" and Mr. Nardi proceeded to explain the difference between the two words and what he meant by lining up business. Lining up business only envisaged Mark getting business Custard could not otherwise handle. But that type of transfer of business or reallocation of work always goes on in this industry even between competitors. So the question becomes, why would Markle talk to Nardi about "lining up" business in this sense in relation to any prospective move by Nardi to Mark. The practice of such reallocation of business or "lining up" as Nardi defined it occurred before he moved to Mark, after he did so and would go on independently of any decision on Nardi's part to go work for Mark.
In any event, after the testimony elicited by his lawyer wherein Mr. Nardi denied soliciting" business for Mark, he told Custard's attorney on cross examination that all of the Custard customers previously mentioned told him that if he went to Mark they would give him their business — but as to Blue Ridge, Mr. Abrams, its representative, talked to him first about such a switch of business, he did not bring it up initially. Yet then Nardi said after Abrams brought it up he asked if Abrams would give him business if he left Custard. This is the scenario Mr. Nardi presented as to all the mentioned customers. Furthermore, even in the midst of all his qualifications about previous testimony where he seemed to flatly admit solicitation of Custard customers he admitted saying, during the conversations with these customer representatives "if you know me, my word means a lot and if I tell you I could do a good job for you wherever I was, I could do a good job for you." This, after hearing all their dissatisfaction with Custard and hearing from him that he was going or thinking of going to Mark. If this was not solicitation and testing the waters to line up business for a competitor one wonders what these words mean.
What is also of some interest are two so-called solicitation reports, prepared by Nardi, introduced as exhibits, dated October 10, 1997 and given to Custard. They concern Blue Ridge and Colonia and both indicate CT Page 5085-fn things are fine regarding their relationship with Custard — in fact, both companies had great potential for new business. Mr. Nardi did not include anything in these written reports about the dissatisfaction representatives of these customers were expressing and explained this by saying he verbally told Custard about their problems. But nothing appears in writing to this effect and how could these reports be considered true and accurate on October 10th" since, according to Nardi, these customers had concerns all along from the time of the takeover. Taking another tack in explaining the solicitation reports, Mr. Nardi at one point appeared to say the dissatisfaction was only as to business outside the northeast region which so happens to be where the bulk of the business he took to Mark is located — this is unconvincing.
In the last analysis, if we focus not just on individual actions or failures to act on Nardi's part but on the series of events that occurred here, there seems to have been a concerted plan on Mr. Nardi's part, while he was an officer with Custard, to benefit himself and a firm he planned to work at his employer's expense. A plan that while it was afoot hurt Custard and when it came to fruition at or soon after his termination benefited a competitor at Custard's expense. There is more than coincidence that seems to be involved here, cf. Dames Moore v.Baxter Woodman, Inc., supra, at 21 F. Supp.2d, p. 824. ABC TransNational Transport v. Aeronautics Forwarders, Inc., et al, supra, at413 N.E.2d p. 1308. To summarize, a few weeks after the Custard takeover, and after Nardi learns of his new compensation arrangement, he starts talking to key subordinates who have worked on his files and who are useful to him in servicing the files of important accounts. He does this after speaking to the competitor who he had previously worked for and telling him that he could bring people along with him from Custard if he switched his employment to the competitor. He talks to the president of the competitor Markle about lining up customers currently dealing with Custard in Mark's area of operations. He has conversations with representatives of these customers about his possible switch to the competitor. He's terminated and lo and behold about the very same time, shortly before or after, three of the employees he approached goes to work for the competitor, Mark, he starts working for Mark and several major accounts switch their business from Custard to Mark.
There was a clear violation of fiduciary duty by Mr. Nardi regarding solicitation of Custard customers and the approaches he made to Custard employees while he was an officer of Custard. The remedy for this matter will be discussed at the conclusion of the opinion.
 TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
In this industry there are apparently no exclusive contracts. The adjustment companies appear to receive business on a seriatim basis. A customer can simply switch its ongoing business from one adjustment company to another as HARRG did in shifting its business from Allied Custard to Mark Adjustment in early November, 1997, just before Mr. Nardi was terminated and went to work for Mark Adjustment. This appears to be a very competitive business.
Therefore, the appropriate claim is probably not one for interference with a contractual relationship but interference with financial expectancies or prospective contractual relations. That is, the interference, if wrongful, would prevent the plaintiff from getting business from these companies; there is no claim, as the court understands it, that the defendant Nardi interfered with the performance of an actual contract commitment, to do adjustment work, in cases previously given by a customer to Allied-Custard.
In any event, Connecticut has long recognized the tort of interference with a financial or business expectancy. Goldman v. Feinberg, 130 Conn. 671,674 (1944); Skeene v. Carayanis, 103 Conn. 708, 714 (1926). Massachusetts follows the same common law in accepting and enforcing this basis for tort recovery. Walker v. Cronin, 107 Mass. 555, 562
(1871); Chenawa Country Golf, Inc. v. Wnuk, 402 N.E.2d 1069, 1072
(1980); Kazmaier v. Wooten, 761 F.2d 46, 51 (Ca. 1, 1985). Under the law of both states there must be an intentional interference, it must be unjustifiable, that is done with legal malice, it must be calculated to cause the plaintiff damage, and must cause actual damage. The claim made here is strikingly similar to that made in Hart, Nininger Associates v.Rogers, 16 Conn. App. 619, 621-622, 629 (1988). Each of the defendants in that case had signed restrictive competitive agreements and were found to have solicited the plaintiff employer's customers while they were working for the plaintiff.
The Restatement (Second) Torts at § 767 lists a variety of factors to be considered in determining whether interference is improper, one of them being the actor's conduct. In comment (a), which further discusses the "actor's conduct," it states at page 32:
 "Business ethics and customs. Violation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods may also be significant in evaluating the nature of the actor's conduct as a factor in determining whether his (sic) interference with the plaintiffs contractual relations was improper or not."
To violate the duty of loyalty one owes to one's employer while actually working for him and/or to violate the terms of a non-compete agreement during the same time and for a period of time after the employment terminates would seem to satisfy Hart, Nininger and the Restatement comment in meeting the definition of that "improper" conduct which would satisfy the requirements for this tort.
All the cases and the commentators also require that there be actual damages caused by the alleged interference; the plaintiff must "show that there was a reasonable expectancy that he would have recovered a profit in the prospective transaction. It is not enough to show a mere possibility of making a profit." Connecticut Law of Torts, Wright, Fitzgerald, Ankerman, § 165, P. 442, see Goldman v. Feinberg, supra at 130 Conn. at pp. 674-675; Massachusetts law is the same, see Kazmaierv. Wooten, supra at 761 F.2d, p. 51.
In this case, the court concludes that the conduct of Mr. Nardi was improper and therefore constituted an unjustified interference in the plaintiffs business relationships and contractual expectancies. The court relies on its discussion and the conclusions it reached in the portions of this decision discussing the breach of contract claim (restrictions on competition) and breach of the duty of loyalty.
As to the requirement of actual loss, the court concludes this element has been sufficiently established for the purpose of this hearing. It is true that as to two of the Allied-Custard customers within the 50 mile radius of the Orange office, HARRG and Blue Ridge, there was credible CT Page 5085-fo testimony from Mr. Nardi that their key representatives were highly dissatisfied with Custard's proposed pricing increases. It is also true that these customers might very well have followed Mr. Nardi to Mark Adjustment in any event. But the point remains that Mr. Nardi gave pricing information concerning HARRG to Mark Adjustment while he was still working for Custard and at around the time Custard, purportedly with his assistance was trying to keep this important account. Interestingly, HARRG transferred its business to Mark Adjustment just before Nardi was terminated and moved to that company also. Furthermore, Nardi encouraged key Custard employees to move to Mark, employees who serviced his business, and Mr. Sullivan of HARRG, the contact man, told Nardi he was totally against Custard's new pricing, but also according to Nardi, had asked him if Mark Adjustment "had the personnel to handle the stuff in New Jersey." Nardi's pre-termination solicitation and approaches to Custard support staff at least in the short run facilitated the customer switch from Custard to Mark and impaired Custard's ability to compete for HARRG, Blue Ridge, Colonnia and Claims Adjustment and business at least in the northeast region.
Furthermore, it is significant to note that despite all the expressed dissatisfaction with Custard's proposed pricing increases, as to HARRG and Blue Ridge, Custard still does business with them in all regions except where Mr. Nardi services them for Mark Adjustment. Custard not only does business with HARRG in other regions not serviced by Mark Adjustment, but Nardi conceded he knew they did not get price increases in those areas. So much for the purported inflexible demand by Custard for price increases.
The court will discuss the appropriateness of injunctive relief when this type of tort is established. Injunctive relief has been given in cases of this type. See Hart, Nininger at 16 Conn. App. pp. 631 et seq;Lavery's Main St. Grill v. Hotel Employees Union, 146 Conn. 93, 103
(1959); also see comment (f) to § 774A of the Restatement (Second) Torts at p. 57.
 CONNECTICUT UNFAIR TRADE PRACTICES ACT
Because the court has concluded Connecticut law applies to claims not having to do with breach of the agreement not to compete, the plaintiff can make a claim under the Connecticut Unfair Trade Practices Act, §42-110a et seq (CUTPA). The court will first discuss the claim as it applies to Mr. Nardi and in a later section will discuss the CUTPA claim as it applies to Mark Adjustment. CT Page 5085-fp
The plaintiff places much reliance on Larsen Chelsey Realty Co. v.Larsen, 232 Conn. 480 (1995). In that case, a real estate brokerage company brought suit against a former employee and a competitor for whom the employee went to work. The claims made were for in part breach of fiduciary duty, tortious interference with business relations and CUTPA violations, id. p. 482. The plaintiff in its July 16, 1999 brief then quite accurately related the facts which the court held the jury could have found in Larsen . . . "While working for the plaintiff, the employee (1) met with the competitor for whom he had previously worked; (2) the competitor offered the employee a job; (3) the competitor told the employee that it would "be happy to speak to any other employees of the plaintiff and might offer them jobs; (4) the employee gave the competitor a list of brokers working for the plaintiff and discussed their backgrounds; (5) the employee then informed his coworkers that the competitor would be happy to interview them and encouraged them to contact the competitor for jobs; (6) the employee then prepared a letter to plaintiffs clients and business contacts stating that the plaintiff would be merging with the competitor; (7) the competitor reviewed and edited this letter; and (8) the employee then began to solicit agents and to sign listings on behalf of the competitor, id. at pp. 484, 507-509."
But Larsen as decided did not turn on whether the actions just alleged constitute a violation of CUTPA. The real significance of Larsen for this case is whether CUTPA can be extended to cover a situation where an employee, while still employed at one company, solicits customers and employees of his employer for the benefit of a competitor. In the discussion on the breach of the duty of loyalty the court concluded that Mr. Nardi did, in fact, solicit key customers of Custard to transfer their business to Mark Adjustment on the expectation of joining that firm himself when enough customers had transferred their business. He also encouraged employees who serviced those customers for him to work for Mark Adjustment and he gave Mark Adjustment pricing information of Custard for no ascertainable purpose other than enabling Mark Adjustment to acquire that customer's, HARRG's, business. That Allied-Custard terminated Nardi first is somewhat irrelevant to the analysis; "beat to the punch" reasoning is not appropriate when the duty of loyalty is at issue. Nardi's activities prior to termination, while he owed Custard that duty, in effect, deprived Custard of a fair opportunity to try to retain or compete for business at least in the short run.
The question under CUTPA then becomes, should this case be distinguished from Larsen because in Larsen, there apparently was explicit evidence, although it is not completely clear from the opinion CT Page 5085-fq that the defendant was hired by the competitor whom he aided while still employed by the plaintiff. Here, Nardi was not actually hired by Mark Adjustment while still working for Custard although he still engaged in activity helpful to this competitor of Custard during this time and after discussing his plans with the competitor. Should this make a difference under the reasoning of Larsen? Why rshould it? CUTPA is an ameliorative act; its whole purpose is to encourage competition that is fair and as discussed in the breach of loyalty part of this decision, the competitive model assumes independent firms competing with each other by being able to rely on their own efficiently operating, loyal staff. As in Larsen, when Nardi breached the duty of loyalty, though employed by Custard, he was acting "outside the scope of his employment relationship with the plaintiff," 232 Conn. at pp. 493-494. The case ofFink v. Golenbock, 238 Conn. 183 (1996), is also instructive. There, the defendant was an employee and 50 percent shareholder in a company. The other 50 percent shareholder sued him under CUTPA alleging the defendant converted corporate assets, tortiously interfered with the company's reasonable business expectations, was unjustly enriched and breached his fiduciary obligations. See discussion in Connecticut Unfair TradePractices Act, Langer, Morgan, Belt, 1996 Supplement § 3.3 at pp. 17-18, where at page 17, commenting on Fink v. Golenbock, the commentators said: "The court rejected the defendant's argument that the action was a dispute over the internal governance of the corporation, holding that the defendant's actions place him in direct corporation with the interests of the corporation." And that is the real point of the Larsen
limitation on Quimby v. Kimberly Clark Corp., 28 Conn. App. 660 (1992), insofar as Quimby held CUTPA not applicable to employer-employee relationships. When an employee acts in a competitive position to his or her own employer and engages in acts helpful to a competitor, the employee acts outside the scope of employment and engages in acts harmful to the fair operation of the competitive system. Therefore, it matters not at all for CUTPA purposes whether at the time the employee so acts he happens to be employed by the entity being harmed and not yet formally employed by the competitor.
In fact, the court believes the same analysis would apply even if the court was not correct in finding that Nardi had, in fact, decided to work for Mark prior to his termination. He acted outside the scope of his employment by engaging in acts violative of his duty of loyalty which, as the court will discuss in a moment, constitute a violation of CUTPA. Thus, as the court has found, he informed employees they were to be terminated which even if true, and the court does not conclude it was for all of them, did not allow Custard to tell these employees in its own time and according to its own schedule. The court cannot accept the CT Page 5085-fr notion that Custard would strip two of its offices of adjusters without any plans to retrain replacements or transfer other personnel. Nardi also gave pricing information to Mark Adjustment regarding HARRG at a sensitive time in Allied-Custard and HARRG relations when Nardi was purportedly trying to keep that account for Allied-Custard. It would be an odd definition of the duty of loyalty that would find no criticism of Nardi's participation in conversations between himself, Shove and Hubbard, high Custard officials and Mr. Sullivan, the key man at HARRG, to keep that account when at or about the same time Nardi was (1) having conversations with Sullivan, even if not "initiated" by Nardi, critical of Custard; (2) encouraging adjustors who served HARRG to go to a competitor when Sullivan expressed concern over whether Mark Adjustment could service his accounts; and (3) talking about the possibility of Nardi's going to work for this competitor.
In any event, the court finds the same actions that indicate Mr. Nardi acted outside the scope of his employment establish that he violated CUTPA. He breached the duty of loyalty and the non-compete agreement. For the reasons stated, CUTPA covers the activities of an employee who acts outside the scope of his or her employment and in a manner helpful to a competitor. Also, these activities did, in fact, constitute unfair acts or practices according to the so-called "cigarette rule" adopted by the federal Supreme Court in FTC v. Sperry Hutchinson Co., 405 U.S. 233
(1972) and followed by our court numerous times, Ivey, Barnum, O'Mara v.Indian Harbor, 190 Conn. 538, 539 fn. 13 (1983);Associated Investment Co. Ltd. Partnership v. Williams Assn. IV,230 Conn. 148, 155 fn. 11 (1994).
Under the three criteria set forth in the "Cigarette rule", the violation of the duty of loyalty offends public policy as established by the common law, first criterion. Under criterion 2 by definition a violation of the duty of loyalty and the acts mentioned constitute a violation of that criteria. As to criteria 3, "substantial injury," even if one speculates that Mark Adjustment or some other company would have gotten the business Custard lost anyway, Mr. Nardi's actions deprived Custard of a fair opportunity to retain and compete for it in the short run at least. Furthermore, this harm could have been easily avoided if Nardi simply had given up his job and then engaged in the acts that are the subject of criticism. (See FTC's unfairness policy statement adopted in 1980 and defining "substantial injury" under "Cigarette Rule," set forth in Volume 2, Appendix J of Langer, Morgan, Belt work, applied inCheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 112-113 (1992). For further discussion of "substantial injury, criterion and "ascertainable loss" see discussion of CUTPA claim as it lies against CT Page 5085-fs Mark Adjustment.
In any event, the court finds that there has been a violation of CUTPA by Mr. Nardi.
Connecticut Uniform Trade Secrets Act
Connecticut has adopted the Uniform Trade Secrets Act (the act), §§35-50 et seq, which basically is a codification of the common law as the court has previously discussed. The common law in turn was set forth in Section 757. Restatement 4 Torts. In fact in its most recent case on the subject, Elm City Cheese Co. v. Federico, 251 Conn. 59 (1999), the court referred to older common law trade secret cases in defining key concepts under the act, see reference to Town Country House and Home Service,Inc. v. Evans, 150 Conn. 314 (1963) at page 69 of Elm City and TriangleSheet Metal Works, Inc. v. Silver, 154 Conn. 116 (19666) at page 74 of Elm City case. Given the fact that several states have adopted the uniform act and the common law basis of the act which operates to define the concept even in states which have not yet adopted the act, the court believes that reference to the cases of other states regarding trade secrets are instructive and relevant.
We should begin with the definition of trade secret in Section35-51(d) of the act where in relevant part it states:
 "(d). . . . `trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
Here the three main items which are claimed to be trade secrets are customer lists, the names of "contact" people working for the customers to whom a salesperson such as Nardi would go looking for business, and pricing information. "Customer lists" by definition can qualify for treatment as trade secrets as well as pricing information, see TriangleSheet Metal Works, Inc. v. Silver, supra, 154 Conn. at p. 126. The names of contact people would also seem to qualify for treatment as trade secrets — this would seem to necessarily follow from the fact that CT Page 5085-ft customer lists can qualify for such treatment, Stanley Tulchin Assoc. v.Vignola, 587 N.Y.S.2d 761, 763 (1992), see Gary Van Zeeland Talent, Inc.v. Sandas, 267 N.W.2d 242 (Wis. 1978) (court did not find customer list there was trade secret under Restatement guidelines but note discussion of facts at p. 245), also cf. Gorman Publ. Co. v. Stillman, 516 F. Sup. 98,105 (N.D. Ill. 1980).
The fact that certain matters can qualify for trade secret consideration in the first instance does not establish them in fact as trade secrets under Section 35-51(d) of the act. The requirements of subsections (1) and (2) of § 35-51(d) must still be met.
 i
First the court will discuss customer lists but that consideration is inextricably bound with the fact that the information about the customer may include not only the customer's identity but also contain information about the contact people for that customer — i.e., who do you get in touch with in the customer's company to get the business.
In determining the protection that should be given to customer lists and information, an older article in the Harvard Law Review gives a good general statement of the balancing factors. In Developments in the Law— Competitive Torts, 77 Harvard Law Review 888, 955-956 (1963) it says:
 "The use of customer lists and contacts by ex-employees stands on the periphery of trade secret law. Written customer lists generally have been regarded as trade secrets when the nature of the industry permits the list to be kept secret and the list cannot readily be duplicated by independent means. The size of the list and the type of information it contains about the customers may be relevant to the latter determination, as may the amount of time and effort which went into its composition.
 "Some economic considerations militate against protecting customer lists. Most are developed in the normal course of business and probably would be produced whether or not protected. The customer benefits from their promulgation, for more firms then compete for his order. Also, once someone has CT Page 5085-fu discovered a customer with particular preferences, it is wasted effort for other firms to have to discover him again. Incentive to compile lists may be strengthened by legal protection in a few cases; and without protection businesses will guard lists more closely, with resulting inefficiency and diversion of resources into industrial security. However, economic arguments for protecting customer lists are at best marginal and the case for protection rests almost entirely on the need to deter employee disloyalty."
The first consideration under subsection (1) of the act is that the items for which trade secret protection is sought must "derive . . . independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."
The case of Town Country House Homes Service, Inc. v. KennethEvans, 150 Conn. 314 (1963) really keyed in on the factors which many of the cases concentrate on:
 "A list of customers, if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money,
constitutes an important part of a business and is in the nature of a trade secret. It is the property of the employer and may not be used by the employee as his own property or to his employer's prejudice. . . . If in any particular business the list of customers is, because of some peculiarity of the business, in reality a trade secret and an employee has gained knowledge thereof as a matter of confidence, he will be restrained from using that knowledge against his employer. . . . On the other hand, where the identity of the customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret." id. pp. 319-20 (emphasis added)
It is the court's understanding that the type of customers companies like Custard and Mark compete for number in the hundreds if not thousands, and that these customers do business commonly with more than CT Page 5085-fv one adjustment company and that there are no exclusive contracts. In rejecting an argument that customer lists in the case before it were trade secrets a New York court said:
. . . "plaintiff's customers were readily ascertainable as likely prospects. Although plaintiffs efforts have demonstrated an investment of time and money in developing a patronage of approximately 15,000 enterprises, the investment was not an attempt to create a new market for a new type of service . . . Rather, that investment reflected simply widespread canvassing of an obvious and highly competitive market, Leo Silfen v. Cream, 328 N.Y.S.2d 423, 429 (1972)."
In Ruesch v. Ruesch International Monetary Services, Inc., 479 A.2d 295
(D.C.Ct. of App., 1984), the court said, "The time and money which a business spends in building up a customer list is an important consideration in determining whether the list is entitled to trade secret protection . . . However, when the prospective clients are commercially conspicuous . . . courts have characterized the expenditures of time, money and resources undertaken by businesses to acquire prospective clients as `simply widespread canvassing of an obvious and highly competitive market' . . . or `merely the outgrowth of . . . normal marketing endeavors,'" id. p. 298. In one case, the plaintiff company, in pressing for trade secret protection, had argued that its complete customer list could not be produced merely by going to directors or going to "sources" in the industry.
The court referred to the language of the uniform act and observed as one of the reasons for rejecting this argument. "Especially in a market where customers did business with more than one sales company or were open to the possibility of shifting business from one company to another . . . it is simply unreasonable to construe the Acts readily ascertainable's standard as requiring exact duplication of the information on the customer list." In that case, as here, there is nothing to indicate Mark or Nardi went after customers they would not have pursued or known about if they had not been on a Custard customer list. Fleming Sales Co., Inc. v. Bailey, 611 F. Sup. 507, 513 (D.C. Ill. 1985) cf. Consolidated Brands, Inc. v. Mondi, 638 F. Sup. 152, 157 (E.D. N.Y., 1986), Allan J. Richardson v. Andrews, 718 S.W.2d 833, 835 (Tex. 1986) (plaintiff in business of structuring settlements on personal injury cases, clients are insurance companies selling annuities. In finding no trade secret protection for client list court noted "most CT Page 5085-fw structured settlement companies use the same markets; "markets" are the insurance companies that sell the annuities used on structured settlements, id., also see Springfield Rare Coin Galleries v. Mileham,620 N.E.2d 479, 485 (Ill. 1973) (headnote 3, 4).
There are cases that suggest that where there is a large group of only potential customers for a service or product and effort must be spent in ascertaining which of these potential customers would in fact be in the market, then trade secret protection might be afforded — that is, if people or companies who actually might be interested in the service have to be winnowed out from various sources they cannot be defined as "readily ascertainable," Cherre Industries, Inc. v. Grounds Associates,278 N.W.2d 81, 90 (Minn. 1979), Inland Rubber Corp. v. Helman,237 So.2d 291, 295 (Fla. 1970), Surgidev Corp. v. Eye Technology, Inc.828 F.2d 452, 454 (CA. 8, 1987), Unistar Corp. v. Child, 415 So.2d 733,734 (Fla. 1982). Cases in this subcategory involve situations where businesses went through special efforts to list customers that had a special receptivity or willingness to do business with companies of offering a special type of product or service. Town Country House Homes Services v. Newberry, 3 N.Y.2d 554, 560, American CreditIndemnification Co. v. Sacks, 262 Cal.Rptr. 92, 97 (1989), Surgidev Corp.v. Eye Technology, Inc., supra. But not all courts agree with even this position. The fact that customer lists are on the periphery of trade secret protection is underlined by a case which did not give such protection where the plaintiff had spent effort winnowing out more likely to buy its particular product. The court said "the customers solicited are openly engaged in business and their names and addresses are readily available in . . ." in an industry directory. A.G.A.Artiebolag v. ABA Optical Corp., 441 F. Sup. 747, 754 (E.D.N.Y., 1977).
Given the reasoning of these cases, the nature of the customer market here does not warrant treating the raw customer lists as trade secrets. These companies trade off business to each other that for one reason or another they cannot service. There is no ascertainable winnowing out process through which Custard or Mark for example try to ascertain which company is more likely to do business or buy their service. Everyone wants to do business at the best price with the most efficient service. Mr. Nardi also testified that in the industry it is relatively easy to find out with whom a particular company is doing business. You just have someone you know in a claims department call and find out for you.
The question remains whether even if the customer lists as such are not entitled to trade secret protection, trade secret protection should be extended the names of so-called customer personnel or "contact" people who you would have to contact to see if they wanted to give you CT Page 5085-fx their business. You could not get this information at least as to many companies by merely looking in business directories and source books and finding out who the customers in the market were. The court has found a case that supports that view. It enforced a restrictive covenant and accepted the argument that the company's customer list not only contained the names of customers but also the names and phone numbers of "key `contact' employees;" as such they were trade secrets or confidential, Stanley Tulchin Assoc. v. Vignola, 587 N.Y.S.2d 761, 763
(1992). The greater number of cases do not accept this view. In OfficeMates, North Shore, Inc. v. Hazen, 599 N.E.2d 1072, 1084 (Ill. 1992) a trade secret claim was made as to certain client information including the "key contact person". The court said the trial "court could properly find that the above information (was) readily available to anyone in the business capable of canvassing or finding a directory whether it be the Yellow Pages or a specialized directory, placing a cold call to that business and asking specific questions designed to elicit the information above. Indeed it was the account executives (defendants here) in this case who developed most of the information in question." Similarly in Image Supplies, Inc. v. Hilmert, 390 N.E.2d 68, 71 (Ill. 1979) the court declined to find a restrictive covenant enforceable on the grounds that its customer lists, purchasing agents of customers and prices it charged were trade secrets or confidential. The court noted that: "Defendant claims that the names of purchasing agents and prices could be readily obtained by asking the customer involved." Why could that not be done here — it is a competitive industry customers presumably are trying to get the mostest for the leastest — why would the person who answers the phone for a prospective customer not immediately direct a call to the contact person? Insofar as there is a further claim here that Nardi has possession of files containing important information about clients beyond even contact persons — a claim never detailed — one court had a succinct answer, the implication of which extends to finding out the identity of contact persons. In Mercer v. C.A. Roberts Co., 570 F.2d 1232, 1239 (CA. 5, 1978) the court said: "It seems obvious that the needs of customers could be readily ascertained through simple observation or contact with each customer." In accord is Cambridge Filter Corp. v. InternationalFilter Co., 548 F. Sup. 1308 (D.Nev. 1982) where the court said: "Likewise, the characteristics of buyers, their special needs and the names of the persons who place orders are not confidential if they could be determined by any prudent sales(person)", id. p. 1310.
What all of these cases appear to be saying is that a customer list or other customer information can constitute a trade secret where the employer developed the information over many years and at great expense, CT Page 5085-fy cf. Prudential Ins. Co. of America v. Van Metre, 511 N.E.2d 740, 745
(Ill. 1987), see Advanced Magnification Inst. v. Minuteman Optical Corp.,
522 N.Y.S.2d 287, 289 (1987). No protection will be given where the information sought to be protected was merely the product of normal marketing endeavors, cf. Gary Van Zeeland Talent, Inc. v. Sandas,267 N.W.2d 242, 250 (Wis. 1978).
Why is all of this so? It is really required, if the trade secret laws, important though they are to ensure fairness in the marketplace, are understood to be exactly what they are — restrictions on competition when they are enforced. There is no indication, for example, in this case that extraordinary effort or expense was required to gamer the information as to customer lists and contact persons which it is now claimed are trade secrets, and normal customer contact would reveal the information sought to be ruled confidential. A competitor in other words would not be put at an unacceptable competitive advantage by getting this information from former employees of a competitor because it could have developed and probably is or has developed the information on its own through its own normal marketing activities. The downside of too broad trade secret protection is that customer choices are limited because the field of competitors is narrowed by judicial fiat — the customers certainly do not mind having their names and contact persons bandied about the industry.
There is perhaps another reason why trade secret protection should not be given to customer lists and contact person information. The cases talk about the employer's involvement in developing the information. Perhaps this reason could be accommodated in the older and broader language of the Restatement defining "trade secrets" but under the act it is hard to fit in anywhere especially as regards subsection (d)(1) of § 35-51. But cases do say that an employee does not breach the duty of loyalty by taking with him or her a customer list the employee developed, Fish v. Adams 401 So.2d 843, 845 (Fla. 1981). In FirstAmerican Ins. Agency v. Gould, 661 P.2d 451, 454 (Mont. 1983) the court held no breach of a covenant not to disclose confidential information was breached where the defendant testified regarding customer information that it "was solely the result of her work experience." InFidelity Fund, Inc. v. DiSanto, 500 A.2d 431, 437 (Pa. 1985) the court said there could be no trade secret protection "in the names of customers previously known to the defendant (former employee) or independently developed by him."
In any event based on all of the above reasoning the court does not believe customer lists or contact persons or any undefined customer CT Page 5085-fz information in this case is entitled to trade secret protection.
The final category of information sought to be protected is pricing information. Mr. Shove testified that this information is important and highly confidential. But why is this so. In this highly competitive industry why would not pricing information be readily available from prospective customers. One would think they would be falling over each other letting the adjustment companies know the pricing of competitors to get the best deal for themselves, cf. Image Supplies, Inc. v. Hilmert,
supra. Furthermore, the court does not believe it was presented with sufficient information about how pricing occurs in this industry to determine whether trade secret protection should be afforded. In other words how often do prices change. As one court said: "Assuming that other information, such as price and discount, is confidential, then there is still no protectable interest because this information changes frequently," Jefco Laboratories, Inc. v. Carroo. 483 N.E.2d 999, 1003
(Ill. 1985).[4]
In any event, the court does not believe a case has been made out to establish there was a violation of our trade secrets act under subdivision (d)(1) of § 35-51. Since the information is not a trade secret, attempting to keep it confidential will not make it so.[5]
Allegations Against Mark Adjustment
The court has ruled against the plaintiff Custard in its claim against Mr. Nardi under CUTSA. For the reasons set forth in that portion of the decision, the court will also conclude that no claim under that statute can be made against Mark Adjustment (Mark).
The court will rely on the general statement of the law regarding the tort of interference with contractual or business relationships and apply it with some variations to the claim against Mark. First, the court will discuss the tortious interference allegation and then the alleged violation of CUTPA. The court must indicate, as the discussion of the breach of duty of loyalty claim makes clear, that it regards as crucial and controlling, the testimony elicited from Nardi by counsel for he plaintiff on November 17, 1998. Later attempts to qualify that testimony were not convincing especially in light of the fact that many of the key points were corroborated, sometimes in a more damaging manner, by admissions Nardi made during the course of an earlier deposition.
 A.
The tortious interference claim has two components or aspects. On the CT Page 5085-ga one hand, Mark is accused of tortiously interfering with the employment relationship Allied-Custard had with Nardi and the four employees approached by Nardi about the possibility of working for Mark. Also, Mark is accused of conspiring or acting with Nardi to tortiously interfere with Custard's business relationships with several customers by having Nardi solicit their business for Mark while still working for Custard. In its discussion, the court will not laboriously repeat all its findings and conclusions as set forth in the breach of the duty of loyalty claim but will rely on that discussion.
 i
In a model of succinctness, from which this court should probably have learned a lesson, the court in Electronics Associates, Inc. v. AutomaticEquipment Development Corp., 185 Conn. 31, 34 (1981) summed up the law in this area when it said:
 "In the absence of fraud, misrepresentation, intimidation, obstruction, molestation or malicious acts, courts generally recognize no liability for inducing an employee not bound by an employment contract to move to a competitor . . . This general rule rests on the policies of encouraging full, fair and free economic competition. . . . and allowing employees to obtain the full value of their services."
This is the law in numerous states. See Dames Moore v. Baxter Woodman, Inc., 21 F. Sup.2d 817, 826 (N.D. Ill., 1998) (under Illinois law); SHV Coal, Inc. v. Continental Grain, 545 A.2d 917, 922 (pa., 1988); Avtec Industries, Inc. v. Sony Corp of America, 500 A.2d 712, 715
(N.J., 1985). But as stated in Architectural Manufacturing Co. v.Airotech, 166 E.2d 744, 746 (Ga., 1969), which was quoting from an earlier Georgia case: "`The fact that an employment is at the will of the employer and employee does not make it at the will of others, and a malicious and wrongful interference with such employment by another is actionable although the employment be at will." Also see Restatement (Second) Torts, § 768(1).
The conduct of a competitor in inducing a rival company's employees to work for the rival is based on the notion that generally such activity is not wrongful as long as improper means are not used. As the court said in Avtec Industries, "`Improper means is a hazy term, difficult to define. It clearly includes such conduct as fraud, misrepresentation CT Page 5085-gb intimidation . . . But it goes much further and includes conduct which fails to accord with generally accepted standards of morality,'" supra at 500 A.2d, p. 715.
Certainly it cannot be said to have comported with accepted standards of business ethics and morality for the president of Mark to indicate to Mr. Nardi that there could be a job for him at Mark, and the feasibility of that prospect would depend on whether this officer of a competitor, while working for that competitor, could "line up" enough of the competitor's customers to switch their business to Mark. All this took place when the president of Mark knew Nardi had signed an agreement with Allied to the effect that he not solicit their customers — at his disposition Nardi said at some point in his ongoing discussions with Mark's president, Markle, he discussed the non-compete agreement he had with Allied — he was not sure at the hearing whether he expressed concern about being bound by it, at the deposition he said he might have expressed those concerns. But why talk about it in the first place?
In any event, Nardi certainly encouraged several Custard employees to leave their employ and go work for Mark, he set up the interviews and told Markle to hire these people. Three took advantage of the opportunity.
It must be said, however, that when an employee leaves his competitor, if the competitor's inducement is not what led to the employee's departure, but the employee's left for personal reasons or out of dissatisfaction with their current employer, then there is no bases to find tortious interference. Obviously, the competitor's inducement did not cause the rival's loss of its employees. See Bray v. Squires,702 S.W.2d 160, 166 (Tex., 1975); National Rejectors, inc. v. Therman,et al, 409 S.W.2d 1, 34 (Mo., 1966). But again Markle knew Nardi was an officer of Custard. Even if these employees were dissatisfied and might have left anyway, even if Custard intended to let them go at some point, Custard had a right to determine the mode and manner of departure and not have to be concerned about an officer of its corporation surreptitiously planning with a rival to have these people go work for that rival. Markel knew at the very least that Nardi wanted to work for his company and was trying to line up Custard customers to make the switch over feasible. At the same time, Markle received recommendations from this future prospective employee, Nardi, to hire Custard employees over whom, as an officer with Custard, Nardi had supervisory power and who worked with him on his accounts. Markle must have guessed that Nardi thought these employees were top rate and would increase his efficiency in competing with Custard and other companies — why otherwise CT Page 5085-gc would Nardi recommend them so vigorously to the new prospective boss especially since they would presumably be Nardi's assistants at Mark Adjustment? In effect, Markle was relying on Nardi's influence and contact with these employees to hire them for himself — an influence and contact furnished courtesy of Custard while Nardi still worked for the latter. To put it more exactly and perhaps more bluntly, Markle was relying on Nardi's breach of his duty of loyalty to help secure his competitor's employees.
As the plaintiff notes, the case of Dames Moore v. Baxter Woodman,Inc., and Simon Golden, 21 F. Sup.2d 817 (N.D., Ill., 1998) is very similar to this case. There the employer brought suit against a former employee, Golden, and the Baxter Company. One of the grounds alleged against the Baxter Company was "tortious interference with business relationships or expectancy with employees." Id., at p. 825. Relying on § 768 of the Restatement (Second) Torts and Illinois case law, the court held that generally a corporation does not interfere with a prospective economic advantage when it solicits the at-will employees of a rival — that is permissible competition. But a competitor may not use wrongful means to solicit such employees. The court found a claim for tortious interference had been stated and a motion for summary judgment by Baxter Woodman would not lie where the allegation had been made that the Baxter company and Golden had conspired to solicit plaintiffs employees to work for Baxter while Golden was still working for the plaintiff as its senior project manager.
The court concludes that the plaintiff has proven this aspect of the tortious interference claim against Mark Adjustment.
 ii
As noted, the plaintiff also advances a CUTPA claim against Mark Adjustment under the unfair acts and practices aspect of § 42a-110(a), et seq. The "Cigarette Rule" formulated in FTC v. Sperry Hutchinson Co., 405 U.S. 233 (1972) has, as noted, been adopted by our court. Furthermore, "the `cigarette rule' standard has been extended under CUTPA to apply not only to customer relations, but to other commercial relations such as competitor relations. This is consistent with the United States Supreme Court's parenthetical inclusion of `competitors or other businessmen' (sic) along with customers when it quoted the "Cigarette Rule" language in S H (i.e. FTC v. Sperry Hutchinson), supra." The Connecticut Unfair Trade Practice Act, Langer, Morgan Beet, Vol. 1 § 2.2, at p. 13. CT Page 5085-gd
The "cigarette rule" as adopted by the FTC uses the following criteria to determine whether a practice is unfair:
 "(1) whether the practice, without having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to customers.
Certainly, tortious interference in employee relationships satisfies the first criteria; that tort has long been recognized as a viable tort theory in our state. In a case like this application of that tort to CUTPA does not rest on some esoteric theorizing; the tort itself is based on notions of what is considered "fair" in competitionl — § 768 of the Restatement (Second) Torts in effect defines unfair competition and sets the ambit of the tort within the definition of what may be considered unfair or unlawful competition, cf. Dames Moore v.Baxter Woodman, et al. supra at p. 21 F. Supp.2d at p. 823.
Such tortious activity by definition is unscrupulous and oppressive — Nardi breached his duty of loyalty in approaching these employees while working for Custard and encouraging them to work for Mark and recommending that Mark hire them. Markle's reliance or use of that breach satisfies that second criteria of the rule.
The injury caused was substantial. Several adjusters were lost to Custard in a short period of time from two offices that were important in servicing customers also solicited by Nardi to switch their business to Mark. Custard had a right to determine if these employees were to be terminated, when, and to consider, the circumstance under which they would be replaced. It is a substantial injury for one of its officers in collusion with the competitor to deprive Custard of the opportunity to weigh and implements these consideration on its own. The injury cannot be said to be outweighed by any countervailing benefits to competition the activities of the defendants at least in the short run unfairly limited the opportunity of Custard to "compete" from its offices in the northeast region. The injury would have been avoided if Mr. Nardi had simply quit Custard before he approached these employees and discussed their employment by Mark, cf. Cheshire Mortgage Service, Inc. v. Montes,
CT Page 5085-ge223 Conn. 80, 112-13 (1992) discusses some of the considerations in determining whether the injury is "substantial".
Also, "ascertainable loss" has been established. The result of these activities by Nardi and Mark Adjustment resulted in the immediate loss of employees from two offices and the opportunity to retain and compete for customers. Not only was there tortuous interference but a violation of the duty of loyalty. Under the act there is no need to prove the amount of any loss — to require proof of actual ascertainable monetary damages would cripple the ameliorative purposes of the act by in effect reading out injunctive relief as a remedy under the act.
The CUTPA violation is not confined to solicitation by Nardi with Mark's cooperation and involvement of Custard employees. Mr. Markle also discussed with Mr. Nardi while he was working for Custard the lining up of Custard customers for Mark as a prerequisite and precondition of Nardi's commencing employment with Mark Adjustment. The court has already discussed Nardi's activities in this area and has concluded he improperly solicited those customers. Also in the midst of Custard's efforts to retain HARRG as a customer, Nardi fed pricing information to Mark that would be helpful to Mark in attracting HARRG's business. Armed with this information, even if it does not rise to the level of a trade secret because of its non-fixed character and ease of ascertainment in a fairly short time, Mark could and did present itself to HARRG as a more favorable competitive option than Custard at an important point in Custard-HARRG negotiations. Interestingly, HARRG switched its business in the northeast to Mark even before Nardi was terminated. And several other customers Nardi had been soliciting with Markle's knowledge while Nardi was employed by Custard switched their business to Mark soon after he joined Mark along with three of the employees had been urging to join Mark. The coincidence of all these events is not the result of happenstance but strongly indicates Mark was the knowing and participating beneficiary of Mr. Nardi's violation of his duty of loyalty.
It was simply improper for Mark to induce Nardi to come work for Mark when the inducement is made for the purpose of encouraging Nardi to have Custard customers to switch their business for Mark while Nardi was still working for Custard. Albee Homes, Inc. v. Caddie Homes, Inc.,207 A.2d 768, 771 (Pa., 1965), SHV Coal, Inc. v. Continental Grain Co.,545 A.2d 917, 922 (1988), Morgan's Home Equipment Corp. v. Martucci, etal, 136 A.2d 838, 847 (Pa. 1957).
The court concludes this activity violates CUTPA and meets the CT Page 5085-gf criteria set for the in the "cigarette rule". Nardi breached his fiduciary obligations in soliciting Custard customers for Mark while still a Custard officer. The evidence indicates he discussed his plans to do so with Mr. Markle and his successful inducement to these customers was, for both parties, a prerequisite to Nardi's joining Mark Adjustment. There was collusion between the parties in this encouragement by Mark to have Nardi violate his common law fiduciary obligations. This conduct was oppressive and unscrupulous as was Mark's receipt of pricing information on the HARRG account from Mr. Nardi. The court relies on the same analysis as previously set forth in this section to conclude that substantial injury and ascertainable loss have been shown.
The plaintiff has established a CUTPA violation.
 REMEDY
The court has found that the plaintiff has proven its case against Mr. Nardi on the grounds of breach of contract, breach of the duty of loyalty, tortious interference with business relationships and CUTPA. The case against Mark Adjustment has been proven on the grounds of tortious interference and CUTPA.
The questions before the court is should injunctive relief be granted and, if so, for how long? First the issue must be addressed concerning which law should apply in determining the appropriateness of injunctive relief. As to the CUTPA claims and the tort claims, which are governed by Connecticut law, the law of our state should apply. What about the injunctive relief that could be granted under the contract not to compete which has a Massachusetts' choice of law provision? What law governs the evidentiary and procedural aspects of such a question and the remedies available if a violation of the agreement is found under Massachusetts law? It has been generally held that "Remedies and modes of procedure depend on the lex fori" (that's a fancy way of saying where you're at, and we're here in Connecticut) — quote is from ThomasIron Co. v. Ensign-Bicford Co., 131 Conn. 665, 668 (1945). Specifically concerning the enforcement of non-compete agreements, it has been held that even where a choice of law clause dictates that the law of a foreign state will apply, a court will apply the law of the forum state in determining whether the plaintiff failed to establish that it would suffer irreparable harm without injunctive relief. The law of the forum determines the sufficiency of the evidence, American Food Management,Inc. v. Henson, 434 N.E.2d 59, 64 (Ill., 1982), citing § 135 of Restatement (Second) of Conflict of Laws. The Restatement takes the view CT Page 5085-gg that burden of proof, presumptions, burden of going forward are all determined by the law of the forum state — the state asked to enforce a right whose substantive aspects are governed by the law of a foreign state, see §§ 133-135. In Hughes Associates, Inc. v.Printed Circuit Corp., 631 F. Sup. 851 (N.D.Ala., 1986), the court had before it a restrictive non-competition agreement that had a Massachusetts choice of law provision. The court held that the proper law to apply with respect to the interpretation and validity of the non-compete clause was that of Massachusetts with the remedy coming from the forum state, Alabama, id. at p. 855, cf. Connshare, Inc. v. ExecucomSystems Corp., 593 F. Sup. 981, 984 (headnote 3) (ED Mich., 1984). See generally, § 986 of 54A Am.Jur.2d. "Monopolies, Restraints of Trade and Unfair Trade Practices," cf. § 135 of Restatement: "The local law of the forum determines the maimer of enforcing a judgment." As comment (a) indicates, the law of the forum "determines . . . whether equitable remedies, as . . . the granting of an injunction, are available, . . ." Connecticut should honor the choice of law provision in the non-compete agreement and the substantive consequences of such a decision as to the meaning of its provisions; this state, however, has the primary interest in determining the mode of relief to be granted and enforced by its courts against one of its citizens. The court will apply Connecticut law as to all questions concerning the propriety and extent of injunctive relief under the agreement and as to all theories of liability against both parties.
The court will analyze the appropriateness and the whole question of injunctive relief within the framework of those cases discussing the propriety of such relief when a breach of a non-compete agreement is found. Those cases are directly on point in raising the general issue of whether and what form injunctive relief should take not only of course as to the breach of contract claim but raise concerns common to all other claims. In other words, they deal with all the issues and concerns relevant to the granting of injunctive relief as to all the claims at least from the court's perspective. Or to put it another way, if the court were to grant particular injunctive relief under the terms of the non-compete agreement, why on earth, given the interrelated facts of this case, would it deny or provide a different ambit of such relief as to one of the other theories of liability?
Should injunctive relief be provided for as a result of the breach of the non-compete agreement. The agreement itself provides that a remedy at law would be "inadequate" for any breach of the agreement and both parties agree that "Allied shall be entitled to injunctive relief in case of any such breach or threatened breach." (Para. 7.) CT Page 5085-gh
Private parties cannot dictate a conclusion that injunctive relief is required especially in the area of employment contracts. The agreement to this effect is probably some evidence, however, that at least the parties were of the opinion that a remedy at law would be inadequate. Under our law: "A party seeking injunctive relief has the burden of proving irreparable harm and lack of an adequate remedy at law," TomassoBros. v. October Twenty-Four, 230 Conn. 641, 648 (1994). But it is fair to say that proof of irreparable harm is not essential when a breach of a non-compete covenant has been proven because "irreparable damage would inevitably result from a violation of the defendant's promise," Mattis v.Lally, 138 Conn. 51 (1951). "The reason for this is that such a plaintiff's actual injury is not susceptible of determination to its entire extent but is estimable largely by conjecture and prediction,"Case v. Zeiff, 10 Conn. Sup. 530, 532 (19). See also Basic Computer Corp.v. Scott, 973 F.2d 507, 511, 512 (Ca. 6, 1992). There is even some suggestion under the case law that a showing of irreparable harm need not be made to secure injunctive relief under a non-compete agreement. Dobbs, Law of Remedies, 2d Ed., Vol 1, § 2.5(2), p. 130, fn i, cf.Capraro v. Lanier Business Products, 466 So.2d 212, 213 (Fla., 1985). But this court concludes irreparable harm was proven in any event.
It is true in this case that the exact determination of the loss visited on Custard by violation of the agreement is difficult to ascertain. The employees Nardi approached to work for Mark, his solicitation of Custard customers all in collusion with Mark may have switched their business and employment to Mark in any event. But breach of the agreement is inextricably bound up with breach of the duty of loyalty. It is difficult, if not impossible, to determine, after the fact, whether the harm Custard suffered would have occurred any way even if the non-compete agreement had not been violated while Nardi was working for Custard along with his violation of the duty of loyalty. Also, it is difficult even to say that Nardi's or Mark's actions caused any loss at all to Custard since profits in this business are so variable and depend on a variety of factors, including even weather conditions, which have an effect on the number of claims needing adjustment. But all of this satisfies the criteria for granting injunctive relief. The legal remedy is inadequate where: "The plaintiff is entitled to damage at law and this would be adequate if damages could be measured with any reasonable degree of accuracy, but under the facts, damages are so speculative that any award is likely to be inadequate," Dobbs, Law of Remedies, 2d Ed., Vol 1, § 2.5(2), pp. 131-132.
It is true that the two year limitation on competition regarding CT Page 5085-gi customers within fifty miles of the Orange office is not on its face unreasonable. The Supreme Court in Scott v. General Iron Welding Co.,171 Conn. 132 (1976), enforced a five year covenant, one and two year covenants have been upheld, see Torrington Creamery v. Danbury,126 Conn. 515 (1940); Hart Nininger Campbell Associates v. Rogers,16 Conn. App. 619 (1988); Robert Weiss Associates v. Wiederlight,208 Conn. 525 (1988). The court has also upheld anticovenant agreements restricted to a reasonably limited market area, see Robert Weiss Associates v. Wiederlight, supra.
But it is for the court to determine whether under the facts of a particular case the restrictive covenant should be enforced according to its terms.
It is implicit in Scott v. General Iron Welding 171 Conn. 132 (1976), that a court must determine the "reasonableness" of any time or geographic restrictions no matter what the parties have agreed to. The factors which should be used to assess "reasonableness" are set out in the Scott case:
(1) the length of time the restriction is in effect
(2) the geographical area covered by the restriction
 (3) the degree of protection afforded to the interest of the employer; is the protection provided fair under all the circumstances
 (4) the extent of the restraint on the employee's opportunity to pursue his occupation, will the employee be precluded from supporting him or herself or the employee's family
 (5) the extent to which the agreement will interfere with the interests of the public, id. p. 137.
An excellent rendition of the test courts use is set out in 54 Am.Jur.2d, § 899, pp. 198-199.
 "In assessing the reasonableness of a covenant not to compete in the employment context, each case must be assessed on the totality of its circumstances and precedents are of little value, except that a CT Page 5085-gj stricter test of reasonableness is generally applied in employment-covenant cases than in sale — covenant cases. Courts consider the nature of the business or profession and employment, the absence or presence of limitations as to the time and space and the reasonableness of the covenant's restrictions as to time, territory and the scope of the activity which is prohibited.
 In determining whether a covenant is reasonably limited with regard to time, territorial effect and the capacity in which the employee is prohibited from competing, the court must balance the interest the employer seeks to protect against the impact the covenant will have on the employee, factoring in the effect of the covenant on the public's interest in promoting competition and the freedom of individuals to contract."
 Also see Dobbs, Law of Remedies, 2d Ed., § 12.22 (2) at p. 499 of Vol. 3.
Another interesting discussion of the problems raised in a case such as this is set forth in Rogers v. Runfola Assoc., Inc., 565 N.E.2d 540
(Oh., 1991), where the court quoted earlier authority and said the following considerations should be taken into account:
 "[T]he absence or presence of limitations as to time and space, * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment." Id., p. 543.
The Rogers court noted that the former employee had gained valuable CT Page 5085-gk technical experience in the business and to that end the former employer had invested time, money and training, id. p. 544. Also see Ferriero v.Associated Materials, Inc., 923 F.2d 1441 (CA. 11, 1991).
In this case, Nardi was a salesperson who had a lot of close contact with customers and their representatives; some special considerations may apply in that type of case especially when the reasonableness of the length of a restriction on competition is being considered.
As indicated, the agreement provides for a two year time limitation. The considerations that determine the reasonableness of such a durational restriction are discussed at § 900, p. 54A Am.Jur.2d.
 "When the restraint is for the purpose of protecting customer relationships its duration is reasonable only if it is no longer than necessary for the employer to put a new person on the job for the new employee to have a reasonable opportunity to demonstrate his or her effectiveness to the customers. Wide ranging frequency of contact between salesperson and customer and a relationship rendered complex by the nature of the products sold and their uses tend to increase the durational period allowed. In addition, limitation of a covenant not to compete to a former employer's customers tends strongly to render the duration of the restraint reasonable."
See also Boldt Machinery Tools, Inc. v. Wallace, 366 A.2d 902, 907
(Pa., 1970); American Security Services, Inc. v. Vodra, 385 N.W.2d 80 (Neb., 1980), [385 N.W.2d 73 (Neb., 1986)]; cf. Blake, Covenants Not toCompete, 731 Harv.L.Rev. 625 (1960), note 1 at p. 659.
What might be called customer service or contact non-compete agreements have been upheld where the time provision is for two years.Robert S. Weiss Associates, Inc. v. Wiederlight, 208 Conn. at p. 532;May v. Young, 125 Conn. at p. 8; New Haven Tobacco Co. v. Perrilli,18 Conn. App. at p. 532.
Taking all these considerations into account is the agreement here enforceable and under what terms; should the court enforce the agreement.[6]
The geographical limitation against competition to a point fifty miles from the Orange office where Mr. Nardi was based is certainly reasonable. CT Page 5085-gl That is the locus in which Nardi would be able to develop those close customer contacts which give rise for a need by Custard to secure the protection of the agreement.
But the geographical issue in this case is directly related to the duration of this agreement insofar as the court must weigh the impact on the employee in providing injunctive relief. Within the fifty mile radius from Orange are located most of Nardi's present customers at Mark, at least in terms of volume of business. For the court, duration is the difficult issue. Should a two year restriction on competition be enforced. The court, throughout this opinion, has discussed the impact of what Mark and Nardi did on Custard and its right to do business. Now that it is prepared to enforce the agreement, other considerations must be taken into account since the court is supposed to act as a court of equity.
The court must evaluate the effect on the employee if the non-compete agreement were to be enforced. The Scott case referred to the economic impact and Robert S. Weiss Associates v. Wiederlight, 208 Conn. 525
(1988) was also concerned with that subject. But these cases were not meant to serve as limitations on broader human concerns. Thus, other courts have taken into account the economic impact especially as it relates to family life and the number of children to support, the resulting need for the employee to change his calling or residence.Standard Register Co. v. Kerrigan, et al, 119 S.E.2d 533, 540 (S.C., 1961), see generally 54A Am.Jur.2d § 899 at p. 200.
Mr. Nardi has started a new family and has a young child. He testified, and the court has no reason not to disbelieve him, that if an injunction were to issue restricting his contact with customers of Custard within a fifty mile radius of the Orange office his business would drop 60 to 70 percent. He could not operate in the business and his livelihood would be impaired. But Mr. Nardi is a personable man with very high skills and the evidence makes clear that there are hundreds of businesses, companies like Mark and Custard, he could go to for the purpose of finding business. And the type of job Allied and Custard provided him with allowed Mr. Nardi to make those personal contacts which have developed sometimes into friendships and this only underlines their interest in and the fairness of injunctive relief.
On the other hand, Nardi developed these contacts on his own with little or no apparent assistance from Allied or Custard in terms of training and technology. Yet these companies did provide him with a staff of efficient adjustors who serviced the very accounts Mr. Nardi CT Page 5085-gm procured by personal approaches to the "contact" people of his customers.
It is also true that this court has no interest or right to stifle competition in this highly competitive industry. One court's comments in a trade secret case are, on this score, highly relevant to the court's problem. In commenting on another case, the court in Hayes-Albion v.Kuberski, 364 N.W.2d 609 (Mich., 1984), the court said at p. 615:
 "There we recognized that although such information is not a trade secret at common law, an employer may have a protectable interest in information about client needs that an employee gains by virtue of his employment. We recognized further, however, that a customer has a right to deal with the person he chooses, and that the remedy for the use of information about a client's needs in violation of an agreement respecting the employee's providing services to the customer after termination of employment, is money damages. To enjoin the employee from providing services would unnecessarily infringe on the customer's exercise of choice in the person with whom the customer deals."
The customers we are talking about appreciate Nardi's skills and apparently think he has a fine support staff of adjusters — how will they react and be affected by this court's decision. We are not talking about widget manufacturers here who produce products that are highly fungible nor are we talking about the delivery of sophisticated services provided by suppliers using the same technology. These are service contracts, much depends on the hard work and skills of individual salespeople and their staff. What forum would HARGG or Blue Ridge go to if the court issues injunctive relief for a long period and Custard does not even bother to compete for the accounts, demands a high price for its services or does not provide trained or experienced adjusters to handle the business once secured?
Neither can the court be oblivious to the fact that these events took place two and one-half years ago. The litigation itself went on from October of 1998 to August of 1999. This is certainly not the fault of Custard and its fine counsel but a reflection perhaps on an overburdened court system. But it is now a fact and Custard is a large and powerful national company which certainly had the resources in that time to set up a competitive team and staff at its offices so as to compete for the business we are talking about. CT Page 5085-gn
The court will issue injunctive relief pursuant to the agreement and also pursuant to the findings it made on other claims it found against both defendants — the same considerations govern the issue of equitable relief as regards those claims as are involved in the non-compete agreement. In any event, the court will issue an injunction for a six-month period against both defendants and orders that they not violate the agreement for the period mentioned and do not service those clients which Nardi solicited, as decided by this court in violation of the agreement, the duty of loyalty and CUTPA. These companies were HARRG, Colonia, Blue Ridge and Claim Adjustment. Their solicitation violated the geographical restrictions of the agreement and apart from the agreement their solicitation merits injunctive relief based on the court's conclusion as to the other legal claims established against the defendants.
Corradino, J.